No. 96-360

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 81

294 Mont. 107

979 P.2d 166

HENRY BALDAUF, JR. and

LOUIS DRYFUSS PROPANE CORP.,

Plaintiffs and Appellants,

v.

ARROW TANK AND ENGINEERING CO., INC.

and JOHN DOES ONE THROUGH TEN,

Defendant and Respondent.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Robert P. Goff, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

James D. Moore, Kalispell, Montana; Frank B. Morrison, Jr., Whitefish, Montana; Donald E. Hedman, Whitefish, Montana

For Respondent:

James T. Martin, Minneapolis, Minnesota; Charles R. Johnson, Great Falls, Montana

Submitted on Briefs: September 3, 1998

Decided: April 20, 1999

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

**¶1. Henry Baldauf, Jr. (Baldauf) and Louis Dryfuss Propane Corp. (Louis Dryfuss) (collectively the Appellants) brought this products liability action against Arrow Tank and Engineering Co., Inc. (Arrow) and John Does one through ten to recover damages sustained when Baldauf?s propane tank trailer rolled over while he was driving. The action proceeded to a jury trial on March 11 through 18, 1996, and a jury verdict and judgment was rendered in favor of Arrow by the Eighth Judicial District Court, Cascade County. Appellants appeal the jury verdict and certain pre-trial, trial, and post-trial rulings made by the District Court. We affirm.**

**¶2. The following issues are presented for review:**

**¶3. 1. Was Arrow?s expert witness, Lawrence Botkin, qualified to give opinion testimony concerning kingpin design, abuse and misuse, metallurgy, and accident reconstruction and analysis?**

**¶4. 2. Was there sufficient evidence to support the jury's verdict?**

**¶5. 3. Did the District Court err in denying Appellants? motion to apply sanctions**

against Arrow for its alleged violation of discovery procedures?

¶6. 4. Did the District Court err in refusing to allow Appellants to introduce, for demonstrative purposes, a photograph of an exemplar kingpin?

¶7. 5. Did the District Court err in adopting the special verdict form submitted by Arrow?

## BACKGROUND

¶8. On August 31, 1987, Baldauf was driving his propane tractor-trailer on a curvy stretch of highway near Fernie, British Columbia, Canada. Baldauf testified that he was traveling at a speed of 55 mph (89 kph) before entering the curves, and that he engaged his jake brake and decelerated to 45 mph (73 kph) as he entered the curves. As he rounded the second curve, he immediately noticed something white in his left rear view mirror. Thereafter, Baldauf?s tractor-trailer rolled and he was injured. Baldauf has no further recollection of the accident.

¶9. The Appellants? theory of the case was that the rollover was caused by failure of the vehicle?s kingpin, the device by which the trailer is hitched to the tractor. Appellants argued that the kingpin severed from its attachment plate, the fifth wheel plate, due to a design or manufacturing defect, which severance then caused the tractor-trailer to roll over. Appellants? principal witness, Mark Firth (Mr. Firth), a metallurgical engineer, examined and tested the subject kingpin. He opined that the kingpin did not have an adequate radius to distribute the concentration of stresses placed on it during its use. Mr. Firth identified cracking in the kingpin and stated that as a result of the inadequate radius, small fatigue cracks developed at the juncture where the kingpin shaft meets the kingpin head, and that these fatigue cracks expanded in service over a number of years culminating in the complete fracture and failure of the kingpin. Mr. Firth opined that this design or manufacturing flaw in the kingpin was further compounded by the fact that the user was precluded from inspecting the affected juncture of the kingpin due to its design. Mr. Firth testified that while the fracture of the kingpin was primarily a ?brittle? fracture, there existed small regions of ?ductile shear,? or metal deformation, near the surface of the fracture site. Based on the presence of ductile shear at the fracture site, Mr. Firth opined that the fracture of the kingpin occurred under ordinary use rather than as a result of the rollover.

¶10. During cross examination, Mr. Firth acknowledged that his expertise did not include specific awareness of design practices of kingpins or design standards used in the kingpin industry. He testified that any component subject to cyclic loading, like the kingpin in this case, will develop fatigue cracking in service. He explained that the user of such a component should inspect the component and, upon observing fatigue cracking, should replace it. When asked whether it was feasible to design a kingpin that has an adequate radius but also is able to be used in the manner for which it was intended, Mr. Firth indicated that he did not know because such knowledge was beyond the scope of his expertise.

¶11. Appellants also presented testimony from John Baker (Mr. Baker), a qualified accident reconstructionist hired by Appellants to give opinion testimony concerning the cause of the accident. Mr. Baker based his analysis on the police report, pictures taken by others at the scene of the accident, and his own inspection of the roadway undertaken seven years after the accident occurred. Mr. Baker calculated the rollover threshold of the subject vehicle and stated that the tractor-trailer could not have rolled over on that curve of the road at a speed less than 71 mph to 74 mph. Based on his examination of the pictures showing the marks on the road and the placement of the vehicle after the accident, as well as his calculation of the rollover threshold of the vehicle, Mr. Baker opined that the accident was not speed-induced, and that the kingpin failed before the rollover.

¶12. Arrow?s theory of the case was that Baldauf was driving too fast for the curve on which he was traveling, which caused the rollover, which in turn caused the kingpin to break. Arrow did not dispute the existence of fatigue cracking in the kingpin, but attributed this condition to the normal application of cyclic stresses on the kingpin as well as abuse or misuse of the kingpin over its twenty years of service. In support of its case, Arrow first presented testimony from Corporal Bryan Lapp (Corporal Lapp) of the Royal Canadian Mounted Police (RCMP) who was called to the scene of the accident to conduct an investigation. Corporal Lapp?s duties with the RCMP included accident reconstruction and collision analysis for which he had several years training and experience. Corporal Lapp testified that he had performed accident reconstruction and analysis in 427 vehicle accidents, 25 of which involved rollovers similar to the present case. He testified he had particular expertise in speed calculations, ?collision contacts and thrust angles,? and ?tractor-trailer rollovers in relation to speed analysis, weight shift, and load shift.?

¶13. Corporal Lapp testified that there are nine characteristics common to skid marks on the road produced by a speed-induced rollover, and that the marks produced by the rollover in this case exhibited ?just about every one? of those characteristics. Although the posted speed limit on the road was approximately 100 kph (60 mph), Corporal Lapp testified that a cautionary sign located some distance before the curve where the accident took place advised drivers to slow to 60 kph (38 mph). Corporal Lapp performed speed calculations utilizing the variables of the radius of the curvature of the tire marks; the gravitational force; the track width of the tire marks; the height of the center of gravity of the vehicle; and the slope of the curvature of the road from one side to the other. Corporal Lapp testified that based on his calculations, Baldauf was traveling at a speed of approximately 88 kph (54 mph) through the curve where his vehicle rolled over.

¶14. Corporal Lapp further stated that, upon inspecting the damage to the tractor and the circular prints located next to the fog line on the side of the road, he surmised that the tractor had been ?slammed down? on its side. In explaining the significance of this finding, Corporal Lapp stated that when a trailer begins to roll, and the slack of the fifth wheel plate, to which the kingpin attaches, diminishes, the trailer ?picks the tractor up and slams it down on the road.? Based on this characteristic of tractor-trailer rollovers, Corporal Lapp opined that the kingpin in the instant case was still intact when the rollover occurred. Corporal Lapp believed that if the kingpin broke and was severed from the fifth wheel plate, the trailer would not be capable of causing the tractor to roll.

¶15. Arrow also called Lawrence Botkin (Mr. Botkin), a mechanical engineer, to give opinion testimony concerning kingpin design, abuse, and misuse, metallurgy, and accident analysis. Appellants were not satisfied with the foundation laid concerning Mr. Botkin?s qualifications as an expert witness and requested permission to voir dire the witness. The court granted the request. After conducting voir dire, Appellants objected to Mr. Botkin?s testimony on the basis of lack of foundation. The court overruled the objection, stating that the jury could determine the weight to be afforded Mr. Botkin?s testimony.

¶16. Mr. Botkin examined and tested the subject kingpin. He refuted Mr. Firth?s conclusion that the forces at work on the kingpin causing it to ultimately fail operated at the rear of the kingpin, the part closest to the trailer, where the fatigue cracking originated. Mr. Botkin identified a ?lip? at the opposite end of the kingpin,

where the ultimate break occurred, and stated that the lip would not exist had the forces operated at the rear. Mr. Botkin agreed with prior testimony describing the metal of the kingpin as very hard and capable of withstanding pressure of 130,000 pounds per square inch. Mr. Botkin opined that even with the fatigue cracking in the kingpin, the forces produced by application of the jake brake or a sudden turning of the vehicle, by Mr. Botkin?s calculations, would not be great enough to cause the kingpin to break.

¶17. Mr. Botkin also identified a ?stress relief groove? on design drawings of the subject kingpin. He explained that this stress relief groove was an integral part of the design of this kingpin because it allowed the kingpin to be ?properly bottomed? on the attachment plate. He testified that if the kingpin were designed with a larger radius as that suggested by Mr. Firth, that is, if it were designed without a stress relief groove, the radius would project below the surface of the kingpin and would hit the square corner of the attachment plate, preventing the plate from properly bottoming the kingpin in place. Mr. Botkin opined that the subject kingpin, when designed and manufactured in 1967, was a commercially acceptable product and did not have any design or manufacturing flaws.

¶18. Mr. Botkin further opined that the subject kingpin had been misused or abused during its service. He explained that when he examined the kingpin, he observed ? massive indentations? or ?gouges.? Mr. Botkin testified that the kingpin was made of very strong material, and that he couldn?t think of anything that would cause such damage other than trying to couple the trailer to the tractor very ?violently,? for example, backing the tractor into the trailer very fast without first opening the jaws of the attachment plate.

¶19. Lastly, Mr. Botkin performed speed calculations and rollover threshold calculations which supported those of Corporal Lapp and refuted those of Mr. Baker. He explained that his and Corporal Lapp?s rollover threshold calculations differed from Mr. Baker?s calculation because Mr. Baker did not take into account the variable of ?the lateral shift of the center of gravity of the tank due to deflection of the springs and deflection of the tire.? He testified that when this variable is taken into account, the rollover threshold is reduced from 71 mph to 55 mph. Mr. Botkin agreed with Corporal Lapp?s conclusion that the particular damage to the cab of the tractor and the circular prints located next to the fog line on the side of the road indicated that the tractor had been slammed down on the road. Based on his

knowledge of tractor-trailer rollovers and his analysis of the particular rollover in this case, Mr. Botkin opined that the subject kingpin broke after the trailer slammed the tractor down on the road.

¶20. After hearing all the testimony presented at trial, the jury found that the subject kingpin was not defective by manufacture or design, and rendered a verdict in favor of Arrow. The District Court entered a judgment in favor of Arrow on March 25, 1996. On April 5, 1996, Appellants filed a motion for partial judgment notwithstanding the verdict and a new trial. On May 29, 1996, the court denied Appellants? motion. This appeal followed.

## DISCUSSION

### *Issue 1*

¶21. Was Arrow?s expert witness, Lawrence Botkin, qualified to give opinion testimony concerning kingpin design, abuse and misuse, metallurgy, and accident reconstruction and analysis?

¶22. We review a district court?s ruling on expert testimony for abuse of discretion. Cottrell v. Burlington Northern R.R. Co. (1993), 261 Mont. 296, 301, 863 P.2d 381, 384. ?The trial court is vested with *great* latitude in ruling on the admissibility of expert testimony.? Cottrell, 261 Mont. at 301, 863 P.2d at 384 (citation omitted).

¶23. Rule 702, M.R.Evid., sets forth the requirements necessary to establish a proper foundation for the admission of expert testimony. *See* Cottrell, 261 Mont. at 301, 863 P.2d at 384. Rule 702, M.R.Evid., provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Appellants argue that the District Court abused its discretion in permitting Mr. Botkin to give opinion testimony concerning kingpin design, abuse, and misuse, metallurgy, and accident reconstruction and analysis because Mr. Botkin lacked the special education, training, and experience to qualify him as an expert in these areas. The thrust of Appellants? argument is that Mr. Botkin is not a metallurgist or an accident reconstructionist by trade, and has no degree in metallurgy or certification in accident reconstruction. Further, Appellants note

that during voir dire, Mr. Botkin testified that, although he had designed kingpin assemblies, he had never designed a kingpin, had never coupled a tractor-trailer using a kingpin, had driven a truck ?only momentarily,? and had never before testified in a products liability case involving a kingpin failure.

**¶24. At the time of trial, Mr. Botkin was a sixty-nine year old retiree engaged in part-time consulting. Mr. Botkin first took metallurgy classes at the University of Michigan in 1942, while in the Reserve Officers Training Corps of the military. In 1948, he received a degree in mechanical engineering from the Missouri School of Mining and Metallurgy. Mr. Botkin testified that although he did not specialize in metallurgy, metallurgy was part of the mechanical engineering curriculum at the Missouri School of Mining and Metallurgy. He stated that he took several classes and lab courses covering the ?whole gamut? of metallurgy.**

**¶25. After obtaining his mechanical engineering degree, Mr. Botkin was hired by Butler Manufacturing to work in that company?s oil equipment division, the division that manufactured truck and trailer tanks. In approximately 1954, Mr. Botkin left Butler and began working as a production services engineer for Westinghouse Electric in that company?s jet engine factory. Mr. Botkin?s duties included working out the ?manufacturing bugs? in the designs from the design department, and working out quality control problems concerning components that had been rejected by government inspectors. A few years later, Mr. Botkin was hired as the chief engineer for Buckeye Iron and Brass Works, a producer of valves and fittings used in gas stations.**

**¶26. In 1961, Mr. Botkin was hired as the chief engineer for Fruehauf Trucking (Fruehauf) in that company?s tank trailer factory. Mr. Botkin explained that August Fruehauf, the founder of the company, invented the concept of the fifth wheel and the idea that a trailer could be separate from its motive unit. He explained that a type of kingpin, different from the kingpins of today, was part of the fifth wheel invention. After working five years in the tank trailer factory, Fruehauf transferred Mr. Botkin to its tank division headquarters and made him chief engineer of the entire division, responsible for overseeing the whole line of production of tank trailers. Mr. Botkin testified that the production of tank trailers included the attachment of kingpin assemblies on the tank trailers. He testified that although he did not design kingpins, he designed kingpin assemblies. He further testified that in his capacity as chief engineer of the division, he established engineering standards for the production of**

tank trailers and supervised new product development projects. Mr. Botkin was also Fruehauf?s representative on industry-government relations. Mr. Botkin testified that Fruehauf manufactured tank trailers very similar to the one manufactured by Arrow in the instant case. Mr. Botkin remained in his position at Fruehauf until his retirement in 1992, a span of more than thirty years.

¶27. Mr. Botkin testified that he was a member of the National Academy of Forensic Engineers and the National Society of Professional Engineers and had attended conferences and workshops sponsored by these organizations. In particular, Mr. Botkin attended a two-day conference on heavy vehicle rollovers which specifically explored the issues involved in this case.

¶28. Mr. Botkin testified that while working for Fruehauf, he was involved in the analysis of more than fifty product liability claims involving trailers brought against the company. He testified that his analyses consisted of reviewing the accident and the equipment damaged in the accident, and piecing together what had happened. He testified that the instant case was his first products liability case involving a kingpin failure. Mr. Botkin testified that he had worked in tandem with accident reconstructionists in the field and was not only familiar with accident reconstruction calculations, but could perform them. He testified he could calculate stopping distances and pre-braking speeds of vehicles involved in accidents. When asked about what training he had in explaining skid and scuff marks on a highway, he explained that he had taken physics in high school and college, had read books on the subject, had attended conferences on the subject, and had worked very closely with top experts in the field concerning the subject.

¶29. Based on these facts and our review of the record, we determine that Mr. Botkin was qualified to give opinion testimony concerning kingpin design, abuse, and misuse, metallurgy, and accident reconstruction and analysis. Mr. Botkin possessed knowledge and experience in all of these areas which was not within the common knowledge or experience of people of ordinary education. *See* State v. Smith (1986), 220 Mont. 364, 377, 715 P.2d 1301, 1309. Although Mr. Botkin may not have had the degree of specialization that Appellants deem appropriate, this does not affect his competency to testify as an expert under Rule 702, M.R.Evid. *See* Marriage of Johansen (1993), 261 Mont. 451, 459, 863 P.2d 407, 413. A witness?s specialization in an area goes to the weight of the witness?s testimony rather than to his or her competency to testify. Johansen, 261 Mont. at 459, 863 P.2d at 413; Wacker v. Park

Rural Elec. Co-op., Inc. (1989), 239 Mont. 500, 501-02, 783 P.2d 360, 361; State v. Oliver (1987), 228 Mont. 322, 327, 742 P.2d 999, 1002. Upon the foregoing, we hold that the District Court did not abuse its discretion in permitting Mr. Botkin to give opinion testimony concerning kingpin design, abuse, and misuse, metallurgy, and accident reconstruction and analysis.

*Issue 2*

¶30. Was there sufficient evidence to support the jury?s verdict?

¶31. Our review of an appeal based upon insufficiency of the evidence to support the jury?s verdict is whether there is substantial evidence in the record to support the verdict. Wise v. Ford Motor Co. (1997), 284 Mont. 336, 339, 943 P.2d 1310, 1312, 1315. We do not decide whether a jury verdict was correct or whether a jury made the right decision. Wise, 284 Mont. at 343, 943 P.2d at 1314. In our examination, we review the facts in the light most favorable to the prevailing party. Wise, 284 Mont. at 339, 943 P.2d at 1312. If conflicting evidence exists, the credibility and weight given to the evidence is in the jury?s province and we will not disturb the jury?s findings unless they are inherently impossible to believe. Wise, 284 Mont. at 339, 943 P.2d at 1312.

¶32. Appellants argue insufficient evidence existed to support the jury?s verdict that Arrow did not sell a kingpin which was defectively manufactured or designed. In arguing insufficiency of the evidence, Appellants assert that the uncontroverted evidence of fatigue cracking in the subject kingpin established *ipso facto* that the kingpin was defective. Appellants further assert that Arrow offered no evidence to counter Appellants? evidence that the kingpin was designed or manufactured in a defective manner. We disagree.

¶33. The District Court instructed the jury that in order to prevail on a manufacturing defect theory, Appellants were required to prove that Arrow sold a product which, *at the time of sale*, had a manufacturing defect. The court defined a defectively manufactured product as one which does not conform in some significant aspect to its intended design. Similarly, the court instructed the jury that in order to prevail on a design defect theory, Appellants were required to prove that Arrow sold a product which, *at the time of sale*, was defective in design. The court defined a defectively designed product as one which presents an unreasonable risk of harm

even though it was made according to the plans of the manufacturer. Further, the court instructed the jury that a product is in a defective condition if it was unreasonably dangerous for its intended or foreseeable purpose. These instructions accurately reflect products liability law. *See* Kuiper v. Goodyear Tire and Rubber Co. (1983), 207 Mont. 37, 60-61, 673 P.2d 1208, 1220-21; Wood v. Old Trapper Taxi (1997), 286 Mont. 18, 24-25, 952 P.2d 1375, 1379-80. In accordance with these instructions, and upon the evidence adduced at trial, the jury found that the subject kingpin did not have a manufacturing or design defect at the time of sale.

¶34. Considering the evidence in a light most favorable to Arrow, as we must, we conclude that substantial evidence existed to support the jury?s verdict. Two expert witnesses, Mr. Botkin and Mr. Firth, testified that any component subject to cyclic loading, like the subject kingpin, will develop fatigue cracking in service. Mr. Botkin testified that the kingpin was adequately radiused with a stress relief groove that allows the kingpin to properly bottom on to the attachment plate. He opined that if the kingpin were designed with a larger radius, the stress relief groove would be eliminated and the kingpin would not properly bottom on to the attachment plate. Further, Mr. Botkin identified gouges in the kingpin indicating that the kingpin had been abused or misused during its lifetime. We have already determined that Mr. Botkin was qualified to give opinion testimony on the issues presented in this case. The credibility and weight to be afforded a witness?s testimony is for the jury to decide. Wise, 284 Mont. at 339, 943 P.2d at 1312. We will not disturb the jury?s findings unless they are inherently impossible to believe. Wise, 284 Mont. at 339, 943 P.2d at 1312. Based on the evidence presented in this case, we conclude that the jury?s findings are not inherently impossible to believe.

*Issue 3*

¶35. Did the District Court err in denying Appellants? motion to apply sanctions against Arrow for its alleged violation of discovery procedures?

¶36. We review a district court?s grant or denial of a request for imposition of sanctions for abuse of discretion. McKenzie v. Scheeler (1997), 285 Mont. 500, 506, 949 P.2d 1168, 1172. We generally defer to the district court's decision "because the trial court is in the best position to know whether parties are disregarding the rights of opposing parties in the course of litigation and which sanctions for such conduct are most appropriate." McKenzie, 285 Mont. at 506, 949 P.2d at 1172.

¶37. According to the District Court?s scheduling order, the discovery deadline imposed on the parties was December 18, 1995. The scheduling order provided that the discovery deadline could not be modified without leave of court. On January 31, 1996, six weeks after the close of discovery, Appellants served interrogatories on Arrow without first obtaining leave of court. Arrow did not answer or file objections to these interrogatories within thirty days as required by Rule 33(a), M.R.Civ.P. On March 11, 1996, the first day of trial, Appellants moved for imposition of sanctions against Arrow pursuant to Rule 37(d)(2), M.R.Civ.P., and requested the court to prohibit Arrow from introducing designated matters in evidence in accordance with Rule 37(b)(2)(B), M.R.Civ.P. The court took the matter under advisement, but suggested that Arrow provide Appellants the information requested. Arrow provided answers to some of the interrogatories on March 11, 1996. Again, Appellants objected to the untimeliness and incompleteness of the answers, but the court took no action.

¶38. Appellants raised the issue a third time in their brief in support of motion for a new trial. In the court?s order denying Appellants? motion for a new trial, the court stated the following:

> **Plaintiff notes that the courts are increasingly assigning serious consequences to failures to comply with legitimate discovery. <u>Owen v. F.A. Buttrey Co.</u>, 192 Mont. 274, 627 P.2d 1233 (1981). The key to Plaintiff**?s argument is that the discovery must be legitimate. In this case, the interrogatories were served a month and one half after the close of discovery, without permission of the [c]ourt. There was some discussion in the original discussion of this matter as to whether . . . Defendant had unilaterally agreed to answer these interrogatories. That discussion is meaningless, since the [c]ourt did not authorize the interrogatories to be served in the first place. No response was technically required thereto. The court imposed upon Defendant to provide the best answers it could to Plaintiff. It did not, however, legitimize the interrogatories by after the fact granting Plaintiff the right to serve them upon Defendant.

¶39. Appellants argue that the court erred in not applying sanctions against Arrow for its ?wilful? failure to answer or file objections to its interrogatories within thirty days as required by Rule 33, M.R.Civ.P. Appellants admit that the interrogatories were served on Arrow after the close of discovery, but argue that this fact does not excuse Arrow from its duty to answer or file objections. We disagree. Rule 37(d)(2),

M.R.Civ.P., authorizes sanctions to be applied against a party who fails to serve answers or objections to interrogatories after *proper service* of the interrogatories. In this case, the interrogatories were not properly served on Arrow because they were served after the close of discovery without leave of court. We agree with the District Court that its request that Arrow provide answers to Appellants? interrogatories did not legitimize Appellants? late service of the interrogatories. Further, we note that the purpose underlying imposition of sanctions is to punish and deter abuses of discovery procedures causing unnecessary delay. Owen v. F.A. Buttrey Co. (1981), 192 Mont. 274, 278, 627 P.2d 1233, 1235. The above facts do not indicate that Arrow in any way abused discovery procedures or caused unnecessary delay. Upon the foregoing, we hold that the court did not abuse its discretion in denying Appellants? motion to apply sanctions against Arrow.

*Issue 4*

¶40. Did the District Court err in refusing to allow Appellants to introduce, for demonstrative purposes, a photograph of an exemplar kingpin?

¶41. We review evidentiary rulings for an abuse of discretion. The district court has broad discretion to determine whether evidence is relevant and admissible pursuant to the Montana Rules of Evidence. Absent a showing of an abuse of discretion, the trial court's determination will not be overturned. Vincelette v. Metropolitan Life Ins. Co., 1998 MT 259, ? 12, 55 St. Rep 1071, ? 12, 968 P.2d 275, ? 12.

¶42. At trial, Appellants sought to introduce a photograph of an exemplar kingpin through their expert, Mr. Firth. Appellants assert that their purpose in introducing this photograph was to show what the subject kingpin looked like before the accident and to show a kingpin with a properly designed radius. The record also shows that Appellants intended to use the exemplar kingpin to aid the jury?s understanding of Mr. Firth?s testimony. The only foundation laid for admission of the photograph of the exemplar kingpin was Mr. Firth?s testimony that the exemplar kingpin was ? fundamentally the same design? as the subject kingpin, except in terms of radius. Mr. Firth could not identify the date and source of manufacture of the exemplar kingpin. Arrow objected to admission of this exhibit on the bases of lack of foundation and prejudice. Arrow pointed out that kingpin designs changed in the 1970's when the practice of ?piggybacking? truck trailers on rail cars produced new stresses on kingpins. Arrow stated that without knowing the date of manufacture of the

exemplar kingpin, there was no way of knowing whether the exemplar kingpin was substantially similar to the subject kingpin manufactured in 1967, or a kingpin made according to the new kingpin designs of the 1970's. The court sustained the objection and refused admission of the photograph, stating that Mr. Firth could refer to other exhibits already admitted into evidence to illustrate his opinion concerning adequate radiusing.

¶43. Appellants argue that the District Court abused its discretion in refusing to admit the photograph. Appellants cite Simonson v. White (1986), 220 Mont. 14, 24, 713 P.2d 983, 989, and argue that the only foundation required for admission of the photograph of the exemplar kingpin was a showing that the exemplar kingpin was ? substantially similar? to the subject kingpin. Appellants argue that Mr. Firth?s testimony provided sufficient foundation for admission of the photograph.

¶44. It appears Appellants have misinterpreted our holding in Simonson. That case involved photographs taken during a re-creation of an accident. The defendant sought to introduce these photographs for demonstrative purposes and show dissimilarities between the accident re-creation and the actual accident. We held:

> **If the conditions of the re-creation are** ?substantially similar? to those at the time of the accident *and the re-creation has been properly foundationed*, there is no abuse of discretion by the trial judge in admitting the evidence.

Simonson, 220 Mont. at 24, 713 P.2d at 989. Clearly, Simonson does not stand for the position advanced by Appellants.

¶45. We agree with Arrow that identification of the exemplar kingpin?s date of manufacture was a necessary foundational requirement for admission of the photograph. Without this information, the photograph could not have served its purpose of demonstrating design flaws in the subject kingpin. We have held that demonstrative exhibits are inadmissible where they do not make clearer some issue of the case, or where they are of such a character as to prejudice the jury. Vincelette, ? 29. We conclude that the court did not abuse its discretion in refusing admission of the photograph based on lack of foundation and prejudice.

*Issue 5*

¶46. Did the District Court err in adopting the special verdict form submitted by Arrow?

¶47. The District Court submitted this case to the jury on a 9-question special verdict form that had been proposed by Arrow. Appellants objected to the use of this form, but did not offer an alternative form. Appellants objected to the special verdict form on the grounds that it was unduly confusing, that it ?unreasonably enhance[d] the likelihood of an inconsistent verdict,? and that it ?put[] unnecessary emphasis on the jury addressing each of the issues separately.? The court overruled the objection.

¶48. On appeal, Appellants advance the same complaints as set forth in the District Court. Additionally, Appellants complain for the first time on appeal that the special verdict form omitted questions pertaining to the issue of whether the subject kingpin was defectively designed due to the inability of its user to inspect it. We will not address either an issue raised for the first time on appeal or a party?s change in legal theory. Unified Industries, Inc. v. Easley, 1998 MT 145, ? 28, 55 St. Rep. 574, ? 28, 961 P.2d 100, ? 28. Accordingly, we decline to address Appellants? objection to the special verdict form concerning the omission of the issue regarding whether the subject kingpin was defectively designed due to the inability of its user to inspect it. We turn then to Appellants? other objections.

¶49. Special verdicts are governed by Rule 49(a), M.R.Civ.P., which provides as follows:

> The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

The use of a special verdict form is left to the discretion of the trial court. Rule 49(a), M.R.Civ.P.; Kinjerski v. Lamey (1981), 194 Mont. 38, 41, 635 P.2d 566, 567. "While it is within the trial court's

discretion to structure the form and frame the questions of a special verdict, the interrogatories must be adequate to enable the jury to determine the factual issues essential to judgment." Kinjerski, 194 Mont. at 41, 635 P.2d at 567. We use a three-part standard to determine the adequacy of a special verdict form:

> 1) whether, when read as a whole and in conjunction with the general charge, the interrogatories adequately presented the contested issues to the jury;
>
> 2) whether the submission of the issues to the jury was fair; and
>
> 3) whether the ultimate questions of fact were clearly submitted to the jury.

Kinjerski, 194 Mont. at 41, 635 P.2d at 568.

¶50. In the instant case, the first question on the special verdict form asked the jury whether Arrow sold a product containing a kingpin which was defectively manufactured and unreasonably dangerous in that it did not conform in some significant aspect to its intended design. If the jury answered ?no? to this question, it was directed to proceed to the fourth question which asked whether Arrow sold a product containing a kingpin which was defectively manufactured and unreasonably dangerous because of its design. If the jury answered ?no? to both the first and fourth questions, it was directed not to answer the remaining questions and instead to sign the special verdict form. Indeed, this is what the jury did: it answered ?no? to the first and fourth questions and signed the special verdict form.

¶51. In support of their position that the special verdict form was confusing and failed to adequately present the issues to the jury, Appellants argue that ?[t]he jury signed off the form using the boxes relating to whether the product was of a defective nature, which was truly a non-issue in this case, and never reached the issues of substance, e.g., causation, at all.?

¶52. The fact that the jury never reached the issue of causation in this case does not render the special verdict form unduly confusing. Our review of the special verdict form indicates that the issues were adequately presented to the jury. We conclude that, when read as a whole, and in conjunction with the general charge and the instructions given the jury, the special verdict form adequately presented the contested issues to the jury, the submission of the issues to the jury was fair, and the ultimate questions of fact were clearly submitted. Accordingly, we hold that the special verdict form submitted to the jury in this case was not confusing and the

**District Court did not abuse its discretion in using this form.**

**¶53. Affirmed.**

**/S/ WILLIAM E. HUNT, SR.**

**We Concur:**

**/S/ TERRY N. TRIEWEILER**

**/S/ JAMES C. NELSON**

**/S/ KARLA M. GRAY**

**/S/ JIM REGNIER**