No. 98-014

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 111

299 Mont. 348

999 P. 2d 985

JAMES A. MICKELSON, Individually,

and VICKIE MICKELSON, Individually,

and on Behalf of Her Minor Children,

ANDREW JAMES MICKELSON,

SCOTT ALLEN MICKELSON, and

TYLER JAMES MICKELSON,

Plaintiffs and Appellants,

v.

MONTANA RAIL LINK, INC.,

Defendant and Respondent.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable Douglas G. Harkin, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

John C. Hoyt (argued), Kurt M. Jackson (argued), Hoyt & Blewett, Great Falls, Montana


For Respondent:

Ronald B. MacDonald (argued), Darla J. Keck (argued), Datsopoulos, MacDonald & Lind, Missoula, Montana


For Amici:

Peter F. Habein, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Montana (Montana Defense Trial Lawyers); Patricia O'Brien Cotter, Cotter & Cotter, Great Falls, Montana (Montana Trial Lawyers Association)


Heard: January 28, 1999

Submitted: February 1, 1999

Decided: April 28, 2000

Filed:


_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Jim and Vickie Mickelson along with their minor children (collectively referred to as "the Mickelsons") brought this action against Montana Rail Link, Inc. (MRL) to recover personal injury damages for the injuries Jim Mickelson (Jim) suffered in a railroad grade crossing accident and for loss of consortium damages suffered by Vickie Mickelson (Vickie) and their three minor children. The case went to trial in the District Court for the Fourth Judicial District, Missoula County, and the jury found in favor of MRL. The Mickelsons appeal. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion

¶2 The issues on appeal are:

¶ 3 1. Did the District Court err in allowing MRL to present evidence that Jim received workers' compensation benefits

¶4 2. Did the District Court err in instructing the jury as to the speed of trains?

¶5 3. Did the District Court err in granting partial summary judgment regarding whether the train crew gave an adequate auditory warning?

¶6 4. Did the District Court err in precluding the Mickelsons' presentation of claims for relief which were not pled in their complaint or in their pretrial order?

¶7 5. Did the District Court err in precluding the presentation of the Mickelsons' claim that MRL had a duty to operate a train that was "plainly visible?"

¶8.6 Did the District Court err in excluding the testimony of the Mickelsons' medical expert witnesses?

¶9 7. Did the District Court err in allowing rebuttal witnesses to testify to issues raised for the first time at trial and in excluding a rebuttal exhibit?

¶10 8. Did the District Court err in allowing certain expert opinion testimony as to a train crew's obligations as they approach a crossing?

¶11 9. Did the District Court err in concluding that the loss of consortium claims of Vickie and the three minor children should be reduced by the percentage of negligence attributable to Jim?

¶12 Because we reverse and remand for a new trial, we do not address issues 4, 6 and 7.

## Factual and Procedural Background

¶13 Jim was severely injured when the vehicle he was operating collided with an MRL freight train at a railroad crossing near the Momont industrial area north of Missoula. The accident occurred on July 10, 1991, at approximately 4 a.m.

¶14 Earlier that same morning, a fire had broken out at the Gallagher Cedar Products Mill west of Missoula. The Missoula Rural Fire Department (MRFD) responded. Jim had been a paid firefighter for MRFD since March 4, 1982. Prior to that time, he had worked as a volunteer for MRFD for several years.

¶15 At first, Jim videotaped the fire for fire investigation purposes, but because MRFD was short handed, Jim was re-assigned to fire suppression duties. There were no water hydrants near the fire, consequently, fire trucks known as "water tenders" had to be used to transport water from a remote water hydrant to the fire site. The Gallagher fire was so large that MRFD had to use four or five water tenders. Because Jim was an experienced water tender driver, he was assigned to Water Tender 20 (WT 20), one of MRFD's largest water tenders.

¶16 WT 20 held approximately 4,000 gallons of water and weighed close to 60,000 pounds when loaded. WT 20, like all of MRFD's emergency vehicles, was equipped with red overhead flashing emergency lights and a siren. The red flashing lights were highly visible at night and, when flashing, meant that WT 20 was responding to an emergency.

¶17 A quick-fill site was established for the water tenders at a high pressure water hydrant located north of the MRL railroad tracks in the Momont industrial area approximately 2½ miles east of the fire. The entrance to this area is located directly across from the entrance to the Missoula airport. This location was selected because of the high flow of water coming out of that hydrant.

¶18 Jim and the other MRFD firefighters were familiar with the Momont hydrant and specific procedures had been developed over the years for loading water tenders at that hydrant. Jim, along with several other firefighters, testified at trial that they had been trained to fill the water tenders by crossing the railroad tracks and proceeding north on Momont Road, past the hydrant, while the water tenders were empty. They would then

turn around at the paved Federal Express parking lot, proceed to the hydrant to fill the water tenders, and then travel the 261 feet to the railroad crossing. The firefighters all testified that they used this procedure because the water tenders were extremely difficult to turn while loaded and the weight of the loaded water tenders would tear up the asphalt in the Federal Express parking lot. Jim has no specific memory of the accident or the events surrounding it, but he testified that he is sure that he would have positioned WT 20 as he had hundreds of times in the past by turning WT 20 around prior to filling it.

¶19 The MRL train that struck WT 20 was traveling from Charlo to Missoula where the crew, engineer Dale Bettisworth and assistant engineer James Puyear, planned to disembark and go home for the night. The train had two locomotives, four loaded cars, and nine empty cars. The train was not carrying any perishable items, it was not on a schedule, and there was no hurry for it to reach Missoula. The train was equipped with a narrow beam headlight. The lead locomotive was also equipped with a standard whistle and bell and a single revolving yellow or amber light, located directly behind the headlight.

¶20 Bettisworth testified that, as the train traveled down Evaro Hill towards Missoula, he saw the fire raging at the Gallagher Mill. He also testified that he saw red flashing emergency lights in the area of the fire and traveling on Highway 10 to the south parallel to the railroad tracks.

¶21 William Brodsky, the president of MRL, testified that there were procedures in place to stop train traffic in emergency situations when notified by 9-1-1 or law enforcement personnel. MRFD, however, did not request that 9-1-1 inform MRL dispatch of the fire or the use of the hydrant across the tracks from the fire. Moreover, Paul Laisey, operations chief of MRFD, testified that, contrary to Brodsky's assertions of cooperation, in a situation sometime prior to the Gallagher fire when MRFD notified MRL that it would be necessary for MRFD to place fire hoses across MRL's tracks to get at a fire, MRL threatened to run over the hoses if they were not immediately removed.

¶22 The Momont crossing is regulated by crossbucks and a stop sign located approximately 17 feet and 26 feet respectively from the crossing. MRL has owned the railroad tracks at this crossing since 1987, thus it is MRL's responsibility to maintain the tracks. Testimony showed that MRL had not done any work on the tracks since July 1988. While some individuals testified at trial that the crossing was extremely rough and that heavy vehicles like WT 20 were required to proceed very slowly over the crossing so as not to incur damage, others testified that this was not the case.

¶23 Bettisworth testified that as the train traveled east towards the Momont crossing, he could see the red flashing emergency lights on WT 20 from over a mile away and that he recognized that it was probably an emergency vehicle. He testified that when he first saw the red flashing lights they were approximately 1140 feet north of the crossing and that they were slowly moving south on Momont Road towards the crossing.

¶24 Nevertheless, the train continued to approach the crossing at a speed of 35 miles per hour, while WT 20 slowly approached the crossing on a collision course. Bettisworth testified that he sounded the train's bell and whistle from a quarter mile west of the crossing and that he assumed the vehicle would yield to the train. Thus, he did not attempt to slow or to stop the train until he realized the vehicle was not going to yield, but by then, it was too late to avoid the accident.

¶25 Jim suffered a severe traumatic brain injury as a result of the accident. His treating physician, Dr. Dean Ross, testified that Jim has numerous, severe and permanent limitations and disabilities as a result of his injuries. He has significant problems with memory, balance and coordination. And, he has severe problems with higher cognitive functioning in the area of abstract reasoning. Dr. Ross testified that, as a result of his disabilities, Jim will never be capable of driving a car or being competitively employed.

26 The Mickelsons brought this action on August 17, 1992, to recover personal injury damages for the injuries suffered by Jim and for loss of consortium damages suffered by Vickie and their three minor children. They contended in their complaint that the accident was caused by MRL's failure to operate its train at a reasonable and safe speed under the circumstances; failure to keep a proper lookout for persons exposed to danger upon its tracks; failure to give a proper warning of the approach of the train; and failure to take appropriate measures to avoid inflicting injury to Jim. The Mickelsons did not assert any claims against MRL in their complaint based on the condition of the Momont crossing or for any alleged obstructions at the crossing that would impair a motorist's view of an oncoming train.

¶27 On November 4, 1993, MRL filed a motion seeking summary judgment as to all allegations of excessive speed or failure to slow, use of strobe or oscillating lights or other attachments, and any allegations regarding the failure to use appropriate auditory warnings prior to impact. After reviewing the arguments made by the parties, the District Court granted partial summary judgment in favor of MRL as to the allegations relating to inadequate lighting and to inadequate auditory warnings, but allowed the Mickelsons to

proceed to trial on their claims of excessive speed or failure to slow.

¶28 On August 2, 1995, the Mickelsons filed a motion in limine to preclude MRL from mentioning or arguing at trial that Jim and Vickie were receiving workers' compensation benefits as a result of the injuries Jim received in the accident. The District Court, in a Memorandum and Order filed February 14, 1996, denied the Mickelsons' motion concluding that MRL should be allowed to show that Jim did not take reasonable steps to mitigate his damages by accepting a re-training employment position because he feared losing his workers' compensation benefits.

¶29 In May 1996, the Mickelsons filed an Application for Writ of Supervisory Control with this Court seeking to rectify certain alleged errors made by the District Court in its rulings on various pretrial motions. These rulings included permitting MRL to introduce evidence of workers' compensation benefits; instructing the jury that the train crew had properly sounded the whistle and bell in compliance with Montana statutes; instructing the jury that any contributory negligence on the part of Jim would be imputed to reduce any loss of consortium damages awarded to Vickie and the children; and disallowing the introduction of any evidence concerning the locomotive's lights to rebut MRL's claim that the train was "plainly visible" to Jim. This Court entered an Order on July 9, 1996, denying the Mickelsons' application on the grounds that the petition failed to meet the appropriate standard for supervisory control.

¶30 In March 1997, the Mickelsons filed a "Reapplication" for Supervisory Control urging this Court to correct the District Court's rulings on the same four grounds as in the earlier application. The Mickelsons based their application on the revised standard for supervisory control which had been adopted subsequent to this Court's denial of their earlier application. *See Plumb v. Fourth Jud. Dist. Court* (1996), 279 Mont. 363, 927 P.2d 1011. However, on May 29, 1997, this Court again denied the Mickelsons' application on the basis that the revised standard was the same as that employed to deny their earlier application.

¶31 The case proceeded to trial on September 2, 1997, before a twelve-person jury. At trial, counsel for MRL asked Dr. Jonathan Stone, one of the doctors that had examined Jim, whether it was his understanding that Jim was resisting supported employment as a result of his fear that he might jeopardize his workers' compensation benefits. Counsel for the Mickelsons objected to the reference to workers' compensation benefits, but that objection was overruled by the District Court.

¶32 Thereafter, in an in-chambers conference, counsel for the Mickelsons moved for a mistrial because of the introduction of workers' compensation benefits into the trial. MRL argued that this evidence was admissible to show that Jim chose not to mitigate his damages and that he was actually malingering by not accepting a supported employment position. The District Court again concluded that MRL could show that Jim did not take reasonable steps to mitigate his damages by accepting a re-training employment position because he feared losing his workers' compensation benefits. Hence, the court denied the Mickelsons' motion for a mistrial and trial resumed with MRL making reference to workers' compensation benefits throughout the proceedings.

¶33 On September 25, 1997, the jury returned a verdict in favor of MRL. This appeal followed.

## Issue 1.

¶34 *Did the District Court err in allowing MRL to present evidence that Jim received workers' compensation benefits?*

¶35 This Court reviews evidentiary rulings for an abuse of discretion. A trial court has broad discretion to determine whether evidence is relevant and admissible. Absent a showing of an abuse of discretion, the trial court's determination will not be overturned. *Baldauf v. Arrow Tank and Engineering*, 1999 MT 81, ¶ 41, 294 Mont. 107, ¶ 41, 979 P.2d 166, ¶ 41 (citing *Vincelette v. Metropolitan Life Ins. Co.*, 1998 MT 259, ¶ 12, 291 Mont. 261, ¶ 12, 968 P.2d 275, ¶ 12).

¶36 We have repeatedly held that the introduction of evidence of workers' compensation benefits or other collateral source benefits constitutes prejudicial and reversible error requiring a new trial. *Mydlarz v. Palmer/Duncan Construction Co.* (1984), 209 Mont. 325, 341, 682 P.2d 695, 703. *See also Thomsen v. State, Dept. of Highways* (1992), 253 Mont. 460, 833 P.2d 1076 (in a personal injury action, admission of evidence concerning availability of medical and rehabilitation services for plaintiff from the Veterans Administration was error); *Allers v. Willis* (1982), 197 Mont. 499, 643 P.2d 592 (the fact that plaintiff, who was injured in an automobile accident, had a pending workers' compensation claim was inadmissible); *Goggans v. Winkley* (1972), 159 Mont. 85, 91, 495 P.2d 594, 598 ("Injection of collateral matters involving transactions between others, which are in this case conjectural, is collateral inadmissible evidence under the collateral source doctrine.").

¶37 MRL argues that while collateral sources are generally excluded from evidence, the prohibition against collateral source evidence is not absolute. MRL contends that in *Thomsen*, this Court followed the California Supreme Court's reasoning that collateral source evidence is admissible if there is a persuasive showing that the evidence sought to be introduced is of substantial probative value. MRL claims that there was substantial probative value in this case to show that Jim failed to mitigate his damages and that the probative value of this evidence outweighed the prejudicial effect.

¶38 In *Thomsen*, this Court did note the California Supreme Court's statement regarding admissibility of collateral source evidence, however, contrary to MRL's contention, we did not follow that reasoning in *Thomsen*. Instead, we determined that the District Court in *Thomsen* erred in allowing the admission of the collateral source evidence and we remanded for a new trial. Furthermore, the California Supreme Court's statement regarding admissibility of collateral source evidence was worded far more strongly against the admission of that evidence than MRL suggests:

> The potentially prejudicial impact of evidence that a personal injury plaintiff received collateral insurance payments varies little from case to case. Even with cautionary instructions, there is substantial danger that the jurors will take the evidence into account in assessing the damages to be awarded to an injured plaintiff. Thus, introduction of the evidence on a limited admissibility theory creates the danger of circumventing the salutary policies underlying the collateral source rule. *Admission despite such ominous potential should be permitted only upon such persuasive showing that the evidence sought to be introduced is of substantial probative value.* [Emphasis added.]

*Thomsen, 253 Mont. at 463, 833 P.2d at 1078 (quoting Hrnjak v. Graymar, Inc. (Cal. 1971), 484 P.2d 599, 604).*

¶39 Additionally, this Court held in *Mydlarz* that it was reversible error for a district court to admit evidence that a plaintiff had received workers' compensation benefits. *Mydlarz*, 209 Mont at 341, 682 P.2d at 703. The plaintiff in *Mydlarz* had filed a motion in limine to prevent the defendant from admitting such evidence. The District Court denied the motion and admitted the evidence, but instructed the jury not to use the evidence of workers' compensation benefits to reduce plaintiff's damages. *Mydlarz*, 209 Mont. at 333, 682 P.2d at 699.

¶40 On appeal, the defendants in *Mydlarz* argued that the evidence of workers' compensation benefits was admissible to show the plaintiff's lack of motive to return to work. *Mydlarz*, 209 Mont. at 340, 682 P.2d at 703. We disagreed and held that "the prejudicial impact of allowing a jury to receive evidence of plaintiff's pending workers' compensation claim vastly outweighs the probative value of such evidence." *Mydlarz*, 209 Mont. at 340-41, 682 P.2d at 703.

¶41 Citing our prior decision in *Allers v. Willis* (1982), 197 Mont. 499, 643 P.2d 592, we ruled in *Mydlarz* that evidence of a workers' compensation claim is clearly inadmissible, and that admission of such evidence was reversible error and would require a new trial. *Mydlarz*, 209 Mont. at 341, 682 P.2d at 703. In reaching that conclusion, we quoted the following passage from *Allers*:

> Generally, it has been held to constitute error, requiring a reversal or new trial, to bring to the jury's attention the fact that the plaintiff in a personal injury or death action is entitled to workmen's compensation benefits. The courts have reasoned that such information would tend to prejudice the jury and influence their verdict, either as to liability or damages, as such information is ordinarily immaterial and irrelevant.

*Mydlarz, 209 Mont. at 341, 682 P.2d at 703 (quoting Allers, 197 Mont. at 503, 643 P.2d at 594-95; 77 A.L.R.2d 1156).*

¶42 MRL contends that evidence of Jim's receipt of workers' compensation benefits was offered for the purpose of providing the jury with an understanding of why Jim chose not to return to work. MRL claims that Jim refused to mitigate his damages by obtaining gainful employment in order to preserve his workers' compensation benefits and that Jim was actually malingering by not accepting a supported employment position.

¶43 The Mickelsons argue on appeal that the District Court abused its discretion when it permitted MRL to introduce evidence that Jim was receiving workers' compensation benefits because there was no proof that the concepts of malingering or secondary gain applied to Jim. Thus, they argue that "the very premise for MRL's entire argument is erroneous and misleading."

¶44 Dr. Stone, a board certified physical medicine rehabilitation specialist and Dr. Ross, a board certified physiatrist, each testified at trial that due to the injuries Jim sustained in the

accident, he is not capable of being gainfully or competitively employed. Dr. Ross had at one time suggested that Jim enter a supported employment program, however, Jim and Vickie decided against it. Contrary to MRL's contention that this was evidence of Jim's failure to take reasonable steps to mitigate his damages, Dr. Ross testified that the supported employment program was merely therapeutic and was not intended as a means for Jim to earn money.

¶45 Moreover, the potential loss of workers' compensation benefits was only one of the reasons Jim chose not accept supported employment. Dr. Ross testified that the Mickelsons had legitimate concerns about the benefit of supported employment for Jim because of his problems with incontinence and depression as well as concerns for Jim's safety. Dr. Ross testified that he was concerned that supported employment would have a negative effect on Jim's pride and self-esteem which would lead to further depression and problems. Since Vickie was able to accomplish in the home setting all of the therapeutic goals that supported employment was intended to achieve, the Mickelsons were able to avoid the problems and concerns associated with a supported employment program.

¶46 MRL contends that even if it was error to allow the evidence of workers' compensation benefits, that error was harmless since the jury did not find MRL negligent and thus that evidence did not impact on the amount of damages awarded. On the contrary, as we stated in *Thomsen*,

> introduction of collateral source evidence may be much more damaging to a plaintiff's case than just affecting the jury's judgment regarding damages. We agree . . . that such evidence can have an impact upon a jury's verdict on the issue of liability, as well as damages.

*Thomsen, 253 Mont. at 464, 833 P.2d at 1078.*

¶47 Accordingly, we hold that the District Court erred in allowing MRL to present evidence that Jim was receiving workers' compensation benefits and we reverse and remand for a new trial.

## Issue 2.

¶48 *Did the District Court err in instructing the jury as to the speed of trains?*

¶49 MRL first raised the issue of train speed when it submitted a motion for summary judgment arguing that the subject of train speed had been preempted by the United States Supreme Court's decision in *CSX Transportation Inc. v. Easterwood* (1993), 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387. However, the District Court denied MRL's motion on the basis that the holding in *Easterwood* provides that under the Federal Railroad Safety Act (FRSA), federal regulations adopted by the Secretary of Transportation preempt negligence claims only insofar as they assert that the train was traveling at excessive speed. The District Court determined that *Easterwood* did not bar suit for breach of related tort law duties, such as a duty to slow or stop a train to avoid a specific individual hazard. In making this determination, the District Court pointed to the Easterwood court's notation that "this case does not present, and [does] not address, the question of FRSA's pre-emptive effect on such related claims." *Easterwood*, 507 U.S. at 675 n.15, 113 S.Ct. at 1743 n.15.

¶50 MRL renewed its motion for summary judgment again arguing federal preemption and that Montana law does not require trains to slow in order to avoid an accident. The District Court once again denied MRL's motion ruling that a negligence action based upon a state law duty to slow or stop a train to avoid a specific individual hazard is not preempted. Even so, when it was time to instruct the jury, the District Court instructed them as follows:

> Under the laws governing the speed of trains, a train crew has no duty to slow a train until a reasonable and prudent train operator has reason to believe, based upon the circumstances present, that the operator of the motor vehicle will not yield to the train and there is a substantial risk of a collision.

Instruction No. 21.

> Montana law does not provide the driver of an emergency vehicle any special privilege in relation to railroad crossings. Emergency vehicle drivers must follow the requirements when approaching and crossing railroad crossing as any other vehicle driver.

Instruction No. 32.

¶51 A district court has discretion regarding the instructions it gives or refuses to give to a jury and we will not reverse a district court on the basis of its instructions absent an abuse

of discretion. *Federated Mut. Ins. Co. v. Anderson*, 1999 MT 288, ¶ 44, 297 Mont. 33 ¶ 44, 991 P.2d 915, ¶ 44 (citing *Fillinger v. Northwestern* (1997), 283 Mont. 71, 76, 938 P.2d 1347, 1350-51). In reviewing whether a particular jury instruction was properly given or refused, we consider the instruction in its entirety, as well as in connection with the other instructions given and with the evidence introduced at trial. *Federated*, ¶ 44. The party assigning error to a district court's instruction must show prejudice in order to prevail. Prejudice will not be found if the jury instructions in their entirety state the applicable law of the case. *Federated*, ¶ 44.

¶52 The Mickelsons argue that the District Court erred in giving this instruction on the speed of trains as the law in Montana has never been that a train can simply ignore a potential hazard at a railroad crossing. The Mickelsons contend that this is not only bad law, but bad public policy and that by giving this instruction the District Court effectively entered a directed verdict in favor of MRL.

¶53 In *Runkle v. Burlington Northern* (1980), 188 Mont. 286, 613 P.2d 982, this Court held that it was a jury question whether, under the circumstances known to the railroad before and at the time of the accident, the railroad itself should have reduced the speed of its trains over the crossing where the accident occurred. *Runkle*, 188 Mont. at 299-300, 613 P.2d at 990.

> Thus it may not be enough for the railroad to protect its crossing with a standard crossbuck, to operate a train within a speed limit or to blow the whistle and ring the bell. The jury is still permitted to determine whether the railroad exercised reasonable care and caution under the circumstances and conditions existing at the time of the accident. *Whether a railroad is negligent in a particular manner*, such as in failing to provide automatic crossing gates, oscillating headlights, flasher lights, or *in failing to reduce its speed is a question of fact for the jury.* [Emphasis added.]

*Runkle, 188 Mont. at 300, 613 P.2d at 991 (citing De Elena v. Southern Pac. Co. (Ariz. 1979), 592 P.2d 759, 762; Seaboard Coast Line R. Co. v. Buchman (Fla.Dist.Ct.App.2d Dist. 1978), 358 So.2d 836, 839-40).*

¶54 MRL contends that all motor vehicles, including emergency vehicles, have a statutory obligation to stop at a railroad crossing:

> (1) Whenever any person driving a vehicle approaches a railroad grade crossing

under any of the circumstances stated in this section, the driver of such vehicle shall stop within 50 feet but not less than 15 feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:

(a) a clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;

(b) a crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train;

(c) a railroad train approaching within approximately 1,500 feet of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;

(d) an approaching railroad train is plainly visible and is in hazardous proximity to such crossing.

Section 61-8-347, MCA. In addition, § 61-8-348, MCA, provides:

**All vehicles to stop at certain railroad grade crossings.** The department of transportation and local authorities may designate particularly dangerous highway grade crossings of railroads and erect stop signs at these crossings. When these stop signs are erected, the driver of a vehicle shall stop within 50 feet but not less than 15 feet from the nearest rail of the railroad *and shall proceed only upon exercising due care.* [Emphasis added.]

MRL further contends that, while the driver of a vehicle is required to yield the right of way to authorized emergency vehicles under § 61-8-346, MCA, a train is not a vehicle as defined by § 61-1-103, MCA, thus the train crew had no obligation to yield the right of way to Jim. Instead, MRL argues that Jim should have yielded to the train pursuant to §§ 61-8-347 and 348, MCA.

¶55 MRL further argues that accepting the Mickelsons' position that trains should slow or stop for emergency vehicles approaching railroad grade crossings would destroy the predictability necessary for the safe operation of trains and motor vehicles at railroad crossings. Emergency vehicle operators cannot be assumed to have the skill and training to

judge the speed, weight, length and stopping distance of trains. Trains cannot swerve out of the way, and even under the best of circumstances, certain trains may take over 4000 feet to stop with full emergency braking. Consequently, MRL maintains that establishing a law that would abrogate the duty of an emergency vehicle to yield to a train "would invite compounded tragedy."

¶56 The Mickelsons argue that the existence of statutes governing the actions of motorists at railroad crossings does not eliminate a railroad's obligation, under *Runkle*, to operate its trains at a reasonable and prudent speed under the circumstances. The statutes quoted above were in effect in 1980 when *Runkle* was decided and they in no way dispense with a railroad's duties and obligations at a railroad crossing as set forth in *Runkle*.

¶57 The Mickelsons point out that the undisputed proof at trial showed that this train could have easily slowed or stopped to avoid the accident. Furthermore, the train carried no perishables and it was going to stop for the night in Missoula, only two miles away. The train had slowed to 20 miles per hour for the DeSmet crossing, and if it had remained at that speed rather than accelerating to 35 miles per hour, it would have arrived in Missoula only three minutes later. The Mickelsons maintain that the District Court's instruction regarding the speed of trains removed all of these circumstances as well as the circumstances of the emergency created by the fire, from the jury's consideration.

¶58 The Mickelsons' proposed instructions regarding the speed of trains stated that, pursuant to Montana law, as set forth in *Runkle*, MRL had a duty to slow or reduce the speed of its train if a reasonable and prudent person would have done so under the circumstances. The instructions given by the District Court in this case improperly removed the question of train speed from the jury's consideration. Instead of being permitted to deliberate on whether, given the circumstances, the train crew should have reduced speed to avoid a collision as required by *Runkle*, the jury was compelled to conclude that the crew did not have a duty to do anything more than they did. The District Court's instructions prevented the jury from deciding whether the facts and circumstances of this case constituted a "specific individual hazard."

¶59 Accordingly, we hold that the District Court abused its discretion in instructing the jury on the speed of trains as the instruction did not state the applicable law of the case.

### *Issue 3.*

¶60 *Did the District Court err in granting partial summary judgment regarding whether the train crew gave an adequate auditory warning?*

¶61 Our standard of review in appeals from summary judgment rulings is *de novo*. *Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 21, 297 Mont. 336, ¶ 21, 993 P.2d 11, ¶ 21 (citing *Motarie v. N. Mont. Joint Refuse Disposal* (1995), 274 Mont. 239, 242, 907 P.2d 154, 156; *Mead v. M.S.B., Inc.* (1994), 264 Mont. 465, 470, 872 P.2d 782, 785). When we review a district court's grant of summary judgment, we apply the same evaluation as the district court based on Rule 56, M.R.Civ.P. *Oliver*, ¶ 21 (citing *Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264, 900 P.2d 901, 903). We set forth our inquiry in *Bruner* as follows:

> The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. We review the legal determinations made by a district court as to whether the court erred.

*Oliver, ¶ 21 (quoting Bruner, 272 Mont. at 264-65, 900 P.2d at 903).*

¶62 Moreover, in a summary judgment proceeding, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences will be drawn therefrom in favor of the party opposing summary judgment. *Oliver*, ¶ 22 (citing *Joyce v. Garnaas*, 1999 MT, 170, ¶ 8, 295 Mont. 198, ¶ 8, 983 P.2d 369, ¶ 8). Consequently, we will view the evidence in the light most favorable to the Mickelsons and all reasonable inferences will be drawn in their favor.

¶63 In its order granting MRL's motion for summary judgment, the District Court ruled, as a matter of law, that the MRL train crew had properly sounded the train whistle and bell in accordance with Montana law, specifically § 69-14-562(7), MCA. Because Jim had no memory of the accident, the District Court held that the Mickelsons could not produce any specific facts that present a genuine issue worthy of trial.

¶64 The Mickelsons argue that summary judgment is inappropriate here because there were too many inconsistencies and credibility problems with the crew's version of the accident. *See Morrow v. FBS Ins. Montana-Hoiness Labar* (1988), 230 Mont. 262, 265,

749 P.2d 1073, 1075 ("where, as here, credibility, including that of the defendant, is crucial, summary judgment becomes improper and a trial indispensable."). The Mickelsons argue, in effect, that MRL never met its burden of proving that no genuine issues of material fact exist, thus the burden to prove otherwise never shifted to the Mickelsons.

¶65 In their brief opposing summary judgment, the Mickelsons point out that the train crew's version of events immediately preceding the accident is entirely inconsistent with Jim's version. Bettisworth and Puyear each testified in their depositions that they first noticed the flashing lights of the water tender when they were about two miles from the crossing. Puyear also testified that the flashing lights were amber, rather than red. Additionally, both Puyear and Bettisworth first identified the water tender as a fuel truck from the airport or a street sweeper. Puyear testified that he saw the vehicle pull away from where it was parked, travel north away from the crossing, make a u-turn, and then head south and proceed all the way down Momont road to the crossing.

¶66 Jim, on the other hand, testified in his deposition that this version of events could not possibly be true. While Jim does not remember any specifics of the accident, he testified that as was his habit and training and contrary to the crew's testimony, he would have turned the water tender around prior to filling at the hydrant. Jim testified that he would have driven the water tender north over the crossing, past the hydrant to the Federal Express lot at the end of Momont road. He would then have turned the truck around, proceeded south on Momont road and parked the water tender next to the hydrant so that it was facing south toward the crossing while he filled it. Jim testified that, after filling the water tender, he would then have proceeded south a short distance to the crossing.

¶67 At trial, the District Court denied the Mickelsons' offered Instruction No. 17--failure to sound the whistle and bell constitutes negligence as a matter of law--and Instruction No. 18--pursuant to *Runkle*, the whistle and bell must be able to be heard at the crossing. The court then instructed the jury that MRL had properly sounded the whistle and bell "in conformity with Montana law" and admonished counsel not to argue to the contrary.

¶68 The Mickelsons argue on appeal that the District Court's ruling on the whistle and bell issue compelled the jury to believe Bettisworth's and Puyear's versions of the accident even though Jim's testimony and the testimony of various MRFD firefighters provided the jury with credible evidence that MRL's version of the events leading up to the accident could not be true. The Mickelsons claim that MRL admits that there were factual and

credibility issues concerning the crew's story about how the accident occurred.

¶69 Since a witness false in one part of his or her testimony is to be distrusted in others, § 26-1-303(3), MCA, the jury should have been allowed to disbelieve the crew's testimony that WT 20 must have turned around after filling at the hydrant rather than before, as was Jim's habit as testified to by Jim and by various MRFD firefighters. The jury then should have been allowed to distrust and reject the crew's story that the whistle and bell were properly sounded. Instead, the District Court's ruling compelled the jury to believe MRL's version of events, even though there was compelling evidence to the contrary.

¶70 The District Court committed reversible error by preventing the jury from deciding crucial factual and credibility issues. *See Easterwood v. CSX Transportation, Inc.* (11th Cir. 1991), 933 F.2d 1548, 1560 n.14 (credibility determinations concerning whistle testimony are not to be made on a motion for summary judgment). *See also Borden v. CSX Transportation, Inc.* (M.D. Ala. 1993), 843 F.Supp. 1410, 1418 (issues of credibility concerning train whistle are properly left for the jury); *Bowman v. Norfolk Southern Railway Co.* (D.S.C. 1993), 832 F.Supp. 1014, 1021 (summary judgment on whistle issue denied because of disputed facts).

¶71 Consequently, viewing the evidence in the light most favorable to the party opposing summary judgment, the Mickelsons, and drawing all reasonable inferences in their favor as we are constrained to do, *Oliver*, ¶ 22, we cannot conclude that MRL met its burden of proving that no genuine issues of material fact existed.

¶72 Accordingly, we hold that the District Court erred in granting partial summary judgment regarding whether the train crew gave an adequate auditory warning and we reverse and remand for a new trial.

## Issue 5.

¶73*Did the District Court err in precluding the presentation of the Mickelsons' claim that MRL had a duty to operate a train that was "plainly visible?"*

¶74 It is undisputed that the MRL locomotive involved in this accident was equipped with a headlight consisting of two 200,000 candela white lights in compliance with 49 CFR § 229.125(a) (1991). The lights were placed next to each other on the front of the locomotive so that they emitted a single narrow beam designed to illuminate a person at

least 800 feet ahead and in front of the headlight. 49 CFR § 229.125(a) (1991). In addition, the locomotive had a yellow or amber blinking light located directly behind the headlight.

¶75 In their complaint, the Mickelsons alleged that MRL was liable for Jim's injuries for, among other things, failing to give a proper warning of the approach of the train. The Mickelsons argued that a single beam headlight, although not inadequate, is an ineffective warning device to motorists.

¶76 MRL moved for summary judgment on the issue of inadequacy of the headlight based upon the preemptive effect of the FRSA. The District Court granted MRL's motion ruling that if the light was in compliance with the FRSA, then the railroad complied with its duty to provide locomotive warning devices as a matter of law, regardless of the fact that the Mickelsons believe that this type of lighting is ineffective.

¶77 In addition, MRL filed a motion in limine requesting that the District Court preclude the mention at trial of additional lighting alternatives for the train. The District Court granted MRL's motion, ruling that the Mickelsons' arguments relating to additional lighting or alternative lighting is preempted by federal statute.

¶78 At trial, in the Mickelsons' case-in-chief, Dr. Bernard Abrams, the Mickelsons' expert witness on conspicuity, was allowed to testify that the locomotive headlight is an ineffective warning device for motorists and that a motorist would have a difficult time identifying a locomotive headlight from the clutter of background lights as in this case. Virginia Tipton, the Mickelsons' expert on railroad operations, was also allowed to testify that the locomotive headlight is not an adequate warning device for motorists.

¶79 During MRL's case-in-chief, Gary Wolf, MRL's expert on railway operations, testified that the locomotive would have been plainly visible to a motorist by "virtue of its speed, by virtue of its headlights and its yellow strobe light." Thereafter, when the Mickelsons' counsel attempted to question Jerry Purswell, MRL's expert specializing in illumination, on the effectiveness of the yellow light, MRL's counsel objected and an in-chambers conference was conducted. After listening to the arguments of counsel, the District Court sustained the objection. The court subsequently instructed the jury that:

> Under Federal law all railroads are required to have one 200,000 candela headlamp on all locomotives. On July 10, 1991, Montana Rail Link locomotive # 116 was equipped with two 200,000 candela headlamps. You are instructed that as a matter

of law, Montana Rail Link met all of its Federal obligations as to locomotive lighting and may not be found negligent as a result of its locomotive lighting configuration.

Instruction No. 27.

¶80 On appeal, the Mickelsons argue that the District Court erred in precluding them from presenting testimony on the effectiveness of the locomotive's yellow blinking light. Relying on *Herold v. Burlington Northern, Inc.* (8th Cir. 1985), 761 F.2d 1241, the Mickelsons argue that since MRL voluntarily equipped the locomotive with the yellow blinking light, the Mickelsons should have been allowed to show that a pair of such lights, situated lower on the front of the locomotive, would have been more effective in providing a warning. The Mickelsons' reliance on *Herold* for this proposition is misplaced.

¶81 In *Herold*, the driver of a motor vehicle and his wife, a passenger in the vehicle, sued the railroad for injuries suffered in a collision with one of their trains. The locomotive in that case had been equipped with an amber rotating beacon, but it had been removed for repairs. The Eighth Circuit Court of Appeals held that the state, through statute or common law, may not require the railroad to install or maintain amber beacons. However, "once any part or appurtenance is attached to a locomotive, the Boiler Inspection Act requires it be maintained in good repair at all times." *Herold*, 761 F.2d at 1246 (citing 45 U.S.C. § 23).

¶82 The Mickelsons claim that, based on *Herold*, MRL had an obligation to make such additional lights "effective," and that once MRL made the decision to equip its locomotive with an additional warning light, it had the obligation to do so effectively and with due care. On the contrary, rather than requiring that the light be "effective," *Herold* mandates that the additional lights simply be maintained "in good operating condition." *Herold*, 761 F.2d at 1246.

¶83 In *Marshall v. Burlington Northern, Inc.* (9th Cir. 1983), 720 F.2d 1149, 1152, the Ninth Circuit Court of Appeals held that

> under the Boiler Inspection Act [45 U.S.C. § 23] the state may not impose liability for failure to install a part or attachment of a locomotive if it is "within the scope of the authority delegated to the [Secretary of Transportation]" to prescribe the same part or attachment.

Moreover, the "failure to maintain" claim in *Herold* is entirely different from the claim that MRL is liable for failing to install a second yellow blinking light which the Secretary of Transportation has not seen fit to require. *King v. Southern Pacific Transp. Co.* (10th Cir. 1988), 855 F.2d 1485, 1489 (citing *Marshall*, 720 F.2d at 1152). The *King* court held that such "failure to install" claims have been rejected. *King*, 855 F.2d at 1489 (citations omitted). Thus, MRL may not be held liable to the Mickelsons for failing to install or reposition blinking lights on its locomotive so as to better alert motorists approaching a crossing of the train's presence.

¶84 While the District Court was correct in precluding the Mickelsons from presenting evidence relating to additional lighting or alternative lighting for the purpose of establishing liability on MRL's part because of *Marshall* and the preemptive effect of the FRSA, that is not to say that such evidence may not be introduced for other purposes.

¶85 The Montana Rules of Evidence demonstrate that in many different instances, evidence which may not be admissible for all purposes may nonetheless be admissible for some. *See, for example,* Rule 408, M.R.Evid. (evidence of offers of compromise must be excluded to prove liability, but may be offered for another purpose); Rule 410, M.R.Evid. (evidence of guilty pleas not admissible against the person who made the offer, but may be admissible for other purposes); Rule 411, M.R.Evid. (evidence that a person is insured against liability is not admissible on the issue of negligence, but may be admissible for other purposes).

¶86 Additionally, Rule 407, M.R.Evid., generally states that subsequent remedial measures are not admissible to prove negligence or culpable conduct, but may be admitted when offered for another purpose. This rule was applied in *Runkle v. Burlington Northern* (1980), 188 Mont. 286, 613 P.2d 982, wherein plaintiffs sought to introduce evidence that after the crossing accident in question, the railroad installed automatic signals at the scene of the collision. In holding that evidence of subsequent remedial measures may be offered for purposes other than establishing liability, we noted:

> In this case, experts testified for the railroad that the crossing was not extra-hazardous. The fact that automatic signals were installed on the crossing after the accident would have been relevant for the purpose of impeachment as well as to show feasibility. It was prejudicial error to exclude this evidence.

*Runkle, 188 Mont. at 294, 613 P.2d at 987.*

¶87 Section 61-8-347, MCA, imposes certain requirements on drivers approaching a railroad grade crossing when "an approaching railroad train is plainly visible and is in hazardous proximity to such crossing." Based on this statute, MRL argues that Jim was negligent in failing to see the train which MRL asserts was "plainly visible." To support this affirmative defense, MRL offered the testimony of Wolf and Purswell who told the jury that the train was indeed plainly visible to Jim, in part because of its headlight and yellow blinking light. In particular, Wolf testified that the approaching train was "plainly visible" because of "its speed, by virtue of its headlights *and its yellow strobe light.*"

¶88 The Mickelsons sought to present contrary evidence that the single yellow blinking light on the locomotive was masked behind the headlight and that if MRL wanted to make its train "plainly visible" at a railroad crossing at night, it should have placed two revolving yellow lights spaced some distance apart lower on the locomotive. While we disagree with the Mickelsons that alternative placement of the lighting has any relevance to whether the train was "plainly visible" to Jim on the night of the accident, we do agree that since MRL was permitted to allege and represent to the jury that its train was "plainly visible," in part because of its yellow blinking light, thereby triggering Jim's alleged duty to stop for the train, the Mickelsons were entitled to rebut and contradict MRL's position by showing that the single yellow blinking light located behind the locomotive's headlight was ineffective as a warning light.

¶89 The District Court erred in prohibiting the Mickelsons from presenting such testimony based on *Marshall* because the Ninth Circuit Court's pronouncements in *Marshall* are not violated by such an argument. *Marshall* provides that the state may not impose *liability* upon the railroad for failure to install particular lighting devices on a train. *Marshall*, 720 F.2d at 1152. In the case *sub judice*, the Mickelsons are not attempting to impose liability based on the effectiveness of the lighting configuration, rather, they are attempting to mitigate Jim's contributory negligence by rebutting MRL's contention that the train was plainly visible. Thus, the proscriptions of the Boiler Inspection Act and *Marshall* are not applicable. And, once experts were allowed to testify that the train was plainly visible, evidence to contradict that contention should have been admissible to rebut the contention that the train was so visible to Jim that he was negligent in failing to see it.

¶90 In *Pitasi v. Stratton Corp.* (2nd Cir. 1992), 968 F.2d 1558, the Second Circuit Court of Appeals determined that evidence which is not admissible to prove culpability may nonetheless be introduced to rebut an affirmative defense. The plaintiff in *Pitasi* was

rendered a quadriplegic when he fell while skiing on a slope that had been only partially closed off due to dangerous conditions. Subsequent to plaintiff's fall, the defendant ski area ordered its employees to place warning signs and ropes across all side entrances to that slope. *Pitasi*, 968 F.2d at 1560.

¶91 At trial, the defendant sought to prove that plaintiff was contributorily negligent and offered evidence to the effect that the dangerous conditions on the slope were so obvious and apparent, that warning signs or ropes were unnecessary. To rebut the contributory negligence evidence, plaintiff sought to introduce evidence of subsequent remedial measures. The court below refused to admit plaintiff's evidence and the jury returned a verdict for the defendant. *Pitasi*, 968 F.2d at 1560.

¶92 The Court of Appeals held that because plaintiff was unable to introduce evidence of subsequent remedial measures, it was impossible for him to rebut the defense of contributory negligence. The Court determined that the trial court's preclusion of this evidence effectively destroyed plaintiff's ability to impeach defendant's employees, who said that the danger was open and obvious. The Court concluded that the probative value of the evidence outweighed its prejudicial effect and that its exclusion constituted an abuse of discretion. *Pitasi*, 968 F.2d at 1561.

¶93 Similarly, in the case before us on appeal, MRL based its defense of comparative negligence on Jim's failure to see MRL's "plainly visible" train. MRL was permitted to offer testimony that the train was highly visible, in part because of its lighting configuration. The Mickelsons sought to refute that contention by offering testimony that the lighting configuration did not make the train plainly visible to approaching motorists. This evidence was not offered to impose liability upon MRL for failing to change its lighting configuration, but rather, to demonstrate that, contrary to MRL's experts, the lighting configuration did not make the train so "plainly visible" that Jim was comparatively negligent for failing to see it.

¶94 In denying the Mickelsons the right to rebut the evidence offered by MRL in support of its contention that Jim was comparatively negligent, the District Court essentially directed a verdict in favor of MRL on the issue of Jim's comparative negligence. Precluding the Mickelsons from rebutting the comparative negligence defense constituted an abuse of discretion, requiring remand and a new trial.

¶95 On remand, the jury should be instructed that while it may not consider MRL's failure

to equip its train with a particular lighting configuration as evidence of MRL's negligence or culpability, it may nonetheless consider such evidence in determining whether the plaintiff was comparatively negligent for failing to see a train which MRL contends was "plainly visible."

¶96 Accordingly, we hold that the District Court did not err in precluding the Mickelsons from presenting evidence to show that MRL was liable for failing to equip its train with a particular lighting configuration. However, we also hold that the District Court did err in precluding the Mickelsons from presenting evidence to refute MRL's contention that Jim was comparatively negligent in failing to see the train which MRL contends was "plainly visible."

## Issue 8.

¶97 Did the District Court err in allowing certain expert opinion testimony as to a train crew's obligations as they approach a crossing?

¶98 As we stated earlier in this opinion, this Court reviews evidentiary rulings for an abuse of discretion. A trial court has broad discretion to determine whether evidence is relevant and admissible. Absent a showing of an abuse of discretion, the trial court's determination will not be overturned. *Baldauf v. Arrow Tank and Engineering*, 1999 MT 81, ¶ 41, 294 Mont. 107, ¶ 41, 979 P.2d 166, ¶ 41 (citing *Vincelette v. Metropolitan Life Ins. Co.*, 1998 MT 259, ¶ 12, 291 Mont. 261, ¶ 12, 968 P.2d 275, ¶ 12).

¶99 Prior to trial, the Mickelsons filed a motion in limine seeking to prevent MRL's witnesses from testifying as to "what the law is or should be or what the duties of motorists or railroads are at a railroad crossing in the state of Montana or that any such duties were violated or not violated." The District Court, relying on *Heltborg v. Modern Machinery* (1990), 244 Mont. 24, 795 P.2d 954, entered an order granting the Mickelsons' motion to the extent that "opinions about statutory or regulatory violations" would be excluded.

¶100 At trial, Bettisworth was permitted to testify that the responsibility of WT 20 was to stop at the Momont crossing and that because of that responsibility, Bettisworth felt he had no reciprocal responsibility, obligation or duty to slow or stop the train to avoid an accident. In addition, MRL's expert, Wolf, was allowed to testify as to how railroads "across the country" operate trains at railroad crossings and as to the obligations of

motorists at railroad crossings. The Mickelsons argue on appeal that by allowing such testimony, the District Court committed prejudicial, reversible error when it had already granted the Mickelsons' pretrial motion in limine on that subject.

¶101 The issue in *Heltborg* was whether the plaintiff's expert testimony invaded the province of the jury by making legal conclusions. The court in *Heltborg* considered Rule 704, M.R.Evid., which provides:

> Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

The court clarified the distinction between testimony on the ultimate factual issue and testimony on the ultimate legal issue in holding that "[c]learly an expert may testify to an ultimate issue of fact. . . ." *Heltborg*, 244 Mont. at 30-31, 795 P.2d at 958. Thus, although an expert may not state a legal conclusion or apply the law to the facts in an answer, an expert may properly testify to an ultimate issue of fact.

¶102 In *Scofield v. Estate of Wood* (1984), 211 Mont. 59, 62, 683 P.2d 1300, 1301-02, this Court held that a highway patrolman may testify as to the cause of an accident. Similarly, MRL's expert witnesses properly expressed opinions as to the cause of the accident in this case, including the obligations and duties Jim and the train crew had at the Momont crossing. MRL's expert, Wolf, testified that he was familiar with Montana law, although he did not discuss what the law was, and that the training of train crews included an expectation that vehicles had obligations to yield at regulated crossings. Wolf did not give an opinion on whether Jim or MRL violated a standard of practice. His testimony was directed to training and the interrelationship between regulation of vehicles at crossings and a train crew's expectations.

¶103 Accordingly, we hold that the District Court did not err in allowing certain expert opinion testimony as to a train crew's obligations as they approach a crossing.

## Issue 9.

¶104 *Did the District Court err in concluding that the loss of consortium claims of Vickie and the three minor children should be reduced by the percentage of negligence attributable to Jim?*

¶105 The District Court ordered early in this case that any contributory negligence on the part of Jim could not be imputed to Vickie and the children in order to reduce their claims for loss of consortium. The court later reconsidered its order and held that the consortium claims could be reduced by the percentage of any contributory negligence attributable to Jim.

¶106 At trial, the Mickelsons proposed a jury instruction advising the jury that the consortium claims would not be reduced by any contributory negligence. The District Court refused this instruction and, instead, instructed the jury as follows:

> Negligence on the part of plaintiff Jim Mickelson does not bar his recovery unless such negligence was greater than the negligence of the defendant MRL. However, the total amount of damages that plaintiff Jim Mickelson would otherwise be entitled to recover will be reduced by the court in proportion to the amount of negligence you attribute to plaintiff Jim Mickelson.
>
> Any damages awarded to plaintiff Vickie Mickelson and any damages awarded to the Mickelson children will also be reduced by any negligence attributable to plaintiff Jim Mickelson.

Instruction No. 41.

¶107 Nevertheless, the jury never reached the damages issue in their verdict because they found that MRL was not liable for Jim's injuries. Thus, the jury never attempted to apportion damages for any contributory negligence attributed to Jim either on Jim's personal injury claim or on the loss of consortium claim of Vickie and the children.

¶108 The Mickelsons argue on appeal that it was error for the District Court to instruct the jury to reduce the consortium claim based on any negligence attributable to Jim because the law applicable at the time of this accident provided that any damages allowed shall be diminished "in the proportion to the amount of negligence *attributable to the person recovering*." Section 27-1-702, MCA (1987) (emphasis added). It is undisputed that Vickie and the children did not cause Jim's accident or injuries. Hence, the Mickelsons argue that under this statute, since negligence cannot be attributed to Vickie or the children, their awards for loss of consortium cannot be diminished.

¶109 The Eighth Circuit Court of Appeals came to the same conclusion in a case

interpreting a nearly identical provision of North Dakota law. In *Herold v. Burlington Northern, Inc.* (8th Cir. 1985), 761 F.2d 1241, 1249, the Court of Appeals determined that under North Dakota law "it is clear that a wife's claim for loss of consortium is an independent right, not contingent upon the rights or liabilities of her husband." Thus, the Court of Appeals concluded that the Supreme Court of North Dakota would not allow a loss of consortium award to be reduced by the other spouse's negligence. *Herold*, 761 F.2d at 1249.

¶110 MRL argues that *Herold* is distinguishable because Montana case law does not hold that a loss of consortium claim is an independent right. MRL, relying in part on *Priest v. Taylor* (1987), 227 Mont. 370, 379, 740 P.2d 648, 653, wherein we stated that a loss of consortium claim is "completely derivative" from the other spouse's claim, maintains that the separate and distinctive nature of consortium is that consortium is a cause of action for separate damages arising out of the spouse's or parent's injury. Thus, MRL argues that a loss of consortium claim is derivative in the sense that it arises out of the injury of the spouse and thus the comparative negligence of an injured spouse or child should likewise act to reduce or bar the loss of consortium claim.

¶111 MRL maintains that the District Court's jury instruction in this case is a logical progression of Montana case law. MRL notes that in *Bain v. Gleason* (1986), 223 Mont. 442, 726 P.2d 1153, this Court made an extensive analysis of how consortium claims were to be handled in insurance cases under limits for "each person." We determined there that "a cause of action for consortium of the deprived spouse is separate and distinct from the claim of the injured spouse. . . ." *Bain*, 223 Mont. at 445, 726 P.2d at 1155. However, in addressing § 61-6-103, MCA, of the motor vehicle statutes, requiring coverage "against loss from the liability imposed by law for damages . . . subject to limits . . . [of] $25,000 because of bodily injury to or death of one person in any one accident," we determined that the separate and distinct claim becomes one with the spouse's injury. *Bain*, 223 Mont. at 449-50, 726 P.2d at 1157.

¶112 Nevertheless, we do not find *Bain* helpful in resolving this issue as our decision in *Bain* turned on the language of the insurance policy regarding the definition of "bodily injury." Furthermore, as the Mickelsons' attorney suggested in oral argument before this Court, labeling a consortium claim "independent" or "derivative" does little to help decide the issue of whether the injured spouse's or parent's alleged contributory negligence should be imputed to the innocent child or spouse.

¶113 Montana case law on this subject uses the terms "independent" and "derivative" almost interchangeably. In *Johnson v. United States* (D.Mont. 1980), 496 F.Supp. 597, 601, the federal district court determined that "under Montana law, a husband or wife may bring an action for loss of consortium, which is a derivative claim, separate and distinct from the spouse's claim for injuries." *See also Gunning v. General Motors Corp.* (1989), 239 Mont. 104, 107, 779 P.2d 64, 66 ("separate and distinct"); *Priest,* 227 Mont. at 379, 740 P.2d at 653 ("independent and distinct" yet "completely derivative"); *Bain*, 223 Mont at 445, 726 P.2d at 1155 ("separate and distinct"); *Keele v. St. Vincent Hospital & Health Care* (1993), 258 Mont. 158, 162, 852 P.2d 574, 577 ("wholly derivative").

¶114 Consequently, the Mickelsons contend that the term "derivative" should be used only to describe the origin of a loss of consortium claim, whereas the terms "separate," "distinct," and "independent" should be used to characterize the nature and extent of the legal rights attendant to the claim. In other words, a loss of consortium claim is derivative to the extent that there has to be a cause of action against the defendant for liability before there can be any recovery on a loss of consortium claim. And, a loss of consortium claim is separate, distinct and independent because it can be brought by a wife without her husband and by children without their parents.

¶115 Other courts have ruled that for a variety of reasons, loss of consortium claims should not be reduced by a spouse's or parent's negligence. *See Macon v. Seaward Construction Co., Inc.* (1st Cir. 1977), 555 F.2d 1; *Huber v. Hovey* (Iowa 1993), 501 N.W.2d 53; *Brann v. Exeter Clinic, Inc.* (N.H. 1985), 498 A.2d 334; *Felch v. General Rental Co.* (Mass. 1981), 421 N.E.2d 67; *Fuller v. Buhrow* (Iowa 1989), 292 N.W.2d 672; *Morgan v. Lalumiere* (Mass. App. Ct. 1986), 493 N.E.2d 206; *Christie v. Maxwell* (Wash. App.Ct. 1985), 696 P.2d 1256; *Lantis v. Condon* (Cal.App.Ct.1979) 157 Cal.Rptr. 22.

¶116 In *Lantis,* the court determined that reducing the wife's award for loss of consortium by the percentage her husband was determined to be contributorily negligent,

> force[s] a plaintiff, who was herself free from fault, to pay a penalty for the negligence of another. Reduced to its bare essentials, the only real effect of holding that [the wife's] action is "derivative" would be to resurrect under a different name the doctrine of imputed negligence a doctrine which has been thoroughly discredited by modern courts . . . and by legal scholars.

*Lantis, 157 Cal.Rptr. at 26. Similarly, Montana law does not penalize innocent parties by*

*imputation of another's negligence. See Sumner v. Amacher (1968), 150 Mont. 544, 437 P.2d 630 (holding that the negligence of a motor vehicle driver cannot be imputed to a passenger, even if the driver and passenger are married). Montana law further provides that neither a husband nor a wife is "answerable" for the acts of the other or liable for the debts contracted by the other. Section 40-2-106, MCA.*

¶117 Under Montana's comparative negligence statute in effect at the time of this accident, any damages allowed "shall be diminished in the proportion to the amount of negligence *attributable to the person recovering*." Section 27-1-702, MCA (1987). As we noted earlier, the Eighth Circuit Court of Appeals interpreted a nearly identical provision of North Dakota law and concluded that a loss of consortium award could not be reduced by the other spouse's negligence. *Herold*, 761 F.2d at 1249. Based partly upon North Dakota judicial decisions holding that, among other things, the negligence of a driver cannot be imputed to his passenger, the Court of Appeals reasoned that under North Dakota law "it is clear that a wife's claim for loss of consortium is an independent right, not contingent upon the rights or liabilities of her husband." *Herold*, 761 F.2d at 1249.

¶118 However, because Herold's negligence was not greater than that of the railroad's, the appellate court did not decide, in light of the statute, the effect on the consortium claim had the fact-finder determined that the plaintiff's negligence in causing his injuries exceeded that of the tortfeasor's. Presuming, on retrial, that MRL will again make the same claims of contributory negligence on Jim's part, this further question not resolved in *Herold*, may become an issue. Accordingly, we deem it appropriate to address that issue here.

¶119 With nearly identical statutory language in Montana regarding comparative negligence and similar judicial decisions regarding non-imputation of negligence, we agree with the Court of Appeals' determination in *Herold* that, where, as in *Herold*, the plaintiff's contributory negligence is determined to be not greater than the negligence of the tortfeasor's, then damages for loss of consortium being independent and, therefore, not contingent upon the rights or liabilities of a parent or spouse, such damages may not be reduced by the other spouse's negligence. But, since our comparative negligence statute states that "any damages *allowed* shall be diminished . . . ," we conclude that while a loss of consortium claim is independent as to damages, it is derivative as to liability. In other words, a defendant must be more liable for a plaintiff's injuries than the plaintiff before there can be any recovery whether it is on the plaintiff's personal injury claim or on a loss of consortium claim stemming from those injuries.

¶120 For example, if plaintiff is determined to be 50% or less contributorily negligent for plaintiff's injuries, then, under our comparative negligence statute, a spouse or child could recover 100% of a loss of consortium claim. If, however, plaintiff is determined to be 51% or more contributorily negligent for plaintiff's injuries, then a spouse or child would recover nothing on a loss of consortium claim.

¶121 We believe this approach--i.e., that liability for a consortium claim is derivative, whereas the right to damages for loss of consortium, once the claim is established, is independent--is not only compatible with (although a refinement of) our prior jurisprudence, but is, as well, consistent with the plain language of § 27-1-702, MCA. Moreover, we conclude that requiring a defendant to pay damages to a consortium claimant where the injured spouse's or child's recovery is barred under our comparative negligence statute, would create an anomaly in the area of tort law and that the legislature could not have intended such a result.

¶122 Accordingly, we hold that the District Court erred in concluding that the loss of consortium claims of Vickie and the three minor children should be reduced by the percentage of negligence attributable to Jim. Therefore, on retrial of this matter, any contributory negligence attributable to Jim cannot be imputed to Vickie and the children to reduce a loss of consortium award. However, if Jim is determined to be more liable than MRL, there can be no recovery for loss of consortium.

¶123 Affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

Justice W. William Leaphart, dissenting in part and concurring in part..

¶124 I dissent on issue number three--the grant of partial summary judgment to MRL regarding whether the train crew gave an adequate auditory warning.

¶125 Citing Morrow v. FBS Ins. Montana-Hoiness Labar (1988), 230 Mont. 262, 749 P.2d 1073, the Court reasons that when credibility is crucial, summary judgment is inappropriate. In *Morrow*, the plaintiff claimed that FBS, a construction bonding agent, used its influence to prevent Fisher, a general contractor, from accepting Morrow's bid. Fisher argued that it denied Morrow's bid because another subcontractor, Star, made a lower bid than the other subcontractors, including Morrow. However, the Court in *Morrow* concluded that there was conflicting testimony regarding Fisher's reasons for accepting Star's bid and that "[t]he question presented by the contradictory statements goes to the heart of Morrow's claim, i.e., did FBS pressure Fisher into awarding the subcontract to Star?" *Morrow*, 230 Mont. at 266, 749 P.2d at 1075. Further, the Court determined that the "issues presented by the offered proof generally involve witness credibility." *Morrow*, 230 Mont. at 266, 749 P.2d at 1075.

¶126 *Morrow* relied on two decisions, Durant v. Stahlin (Mich. 1965), 135 N.W.2d 392, and Arnstein v. Porter (2nd Cir. 1946), 154 F.2d 464, for the proposition that summary judgment is improper "where the credibility of an affiant may be crucial to decision of a material fact." *Morrow*, 230 Mont. at 265, 749 P.2d at 1075. The reliance of the Court both in *Morrow* and in the present case on *Durant* is misplaced. First, the *Durant* court affirmed the trial court's grant of summary judgment, determining that there was "no issue of fact." *Durant*, 135 N.W.2d at 395. Second, the Court in *Morrow* cited not to the majority opinion in *Durant* but rather to a *concurring* opinion that opined that "when resolution of a disputed fact, presented by conflicting affidavits or other proofs, depends upon the credibility of an affiant or witness, the trial judge engaged in an inquiry on motion for summary judgment must not usurp a trial jury's right . . . to determine the affiant's credibility." *Durant*, 135 N.W.2d at 398 (Souris, J. concurring). In *Arnstein*, the court reviewed a grant of summary judgment on a claim of copyright infringement. The trial court had depositions by the plaintiff and the defendant concerning whether the defendant had access to plaintiff's musical compositions. The trial court concluded that plaintiff's account was "fantastic" and not credible. *Arnstein*, 154 F.2d at 469. The *Arnstein* court concluded that on the critical question of access, plaintiff's credibility, even as to the improbable parts of his account, was for the jury to decide. The court in *Arnstein* reasoned that if the jury disbelieves the defendant, the jury could infer that the defendant had access to the plaintiff's compositions and that "[i]t follows that, as credibility is unavoidably involved, a genuine issue of material fact presents itself." *Arnstein*, 154 F.2d at 469. Thus, in *Arnstein* and *Morrow*, there was conflicting evidence on material questions of fact. *Compare* Miller v. Herbert (1995), 272 Mont. 132, 138, 900 P.2d 273, 276 (rejecting plaintiff's reliance on *Morrow* and concluding in *Morrow* that "the record

contained specific statements of fact contradicted by specific statements of fact of other witnesses").

¶127 Finally, the Court cites three decisions for the proposition that credibility determinations about train whistle blowing are not appropriate for summary judgment. *See* Easterwood v. CSX Transp., Inc. (11th Cir. 1991), 933 F.2d 1548, 1560, n.14; Borden v. CSX Transp., Inc. (D. Ala. N.D. 1993), 843 F.Supp. 1410, 1418; and Bowman v. Norfolk Southern Ry. Co. (D. S.C. 1993), 832 F.Supp. 1014. In each one of these decisions, much like *Arnstein* and *Morrow*, there again was conflicting testimony on material questions of fact, that is, questions as to whether auditory warnings were given. For example, in *Bowman*, both parties moved for summary judgment on the plaintiff's claim for failure to sound the warning signals as required by law. The court denied plaintiff's motion because there was evidence that the bell was ringing continuously from the start of the train's trip that morning. *Bowman*, 832 F.Supp. at 1021. Similarly, defendant's motion for summary judgment on this issue was denied because a jury could conclude that the bell was in fact not operating at the time of the accident. "Whether the appropriate signal was given in this case is disputed and is, therefore, a question for the jury." *Bowman*, 832 F.2d at 1021. In denying summary judgment, the court was not relying upon lack of credibility as to an extraneous issue of fact. Rather it found that there was a dispute as to the *material fact* at issue in the motion; in other words, was the bell sounded. This is in contrast to the present case where the Mickelsons appear to have offered no evidence to controvert the crew's testimony that it gave a proper warning at the time of the accident.

¶128 The Court cites the principle, under § 26-1-303(3), MCA, that a witness false in one part of his or her testimony may be distrusted in others. The Court then notes that there were inconsistencies between the crew's testimony and Mickelson's deposition testimony regarding whether he turned around on Momont Road before he reloaded the truck and from this concludes that the jury should therefore be allowed to disbelieve the crew's testimony as to whether the whistle and bell were sounded. In doing so, the Court abandons the criterion of materiality. The sole issue before the Court on MRL's motion for partial summary judgment was whether the auditory warnings were given. There was no dispute in the evidence on that material fact.

¶129 The conflicting evidence regarding whether Mickelson filled the firetruck's water tank before or after he turned around on Momont Road is not probative of whether the train crew gave adequate warning of its approach. Assuming that the crew's version of the turn around was not credible, it does not raise a dispute as to a fact material to the issue of

whether the whistle and bell were sounded. Moreover, neither Mickelson nor the Court has suggested any reason why the train crew might lie regarding when Mickelson filled the firetruck's water tank. As MRL did not deny having seen Mickelson's vehicle approaching the track, what he did prior to that juncture is irrelevant to the question of whether the crew sounded the whistle.

¶130 In Anderson v. Liberty Lobby, Inc. (1986), 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (emphasis added) (citation omitted), the Court concluded:

> substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Factual disputes that are irrelevant or unnecessary will not be counted.*

¶131 The Court's holding could substantially diminish the burden of nonmoving parties in summary judgment proceedings. For a nonmoving party to defeat a motion for summary judgment when it offers no evidence on a material question of fact, that party would apparently need only to present evidence raising doubt about the credibility of a moving party's witness on a nonmaterial question of fact. For example, assume that a plaintiff injured in an intersection collision moves for summary judgment on liability and presents an uncontroverted affidavit that the defendant was speeding and did not have the right of way. Under the Court's approach in the present case, the defendant could avoid summary judgment by arguing that plaintiff was inconsistent in his testimony as to whether another vehicle went through the intersection ahead of defendant's. Thus, despite the fact that the existence of a third vehicle is totally immaterial to the question of defendant's liability, summary judgment would be properly denied because the defendant raised an issue as to the plaintiff's credibility on an extraneous fact.

¶132 Since there was no dispute as to the material fact at issue (whether, in the present case, the whistle and bell were sounded), I would affirm the District Court's grant of partial summary judgment.

¶133 I specially concur as to issue number five--did the court err in granting summary judgment on the question of whether the train was "plainly visible." The Mickelsons, relying on Herold v. Burlington Northern, Inc. (8th Cir. 1985), 761 F.2d 1241, contended that they should have been allowed to show that MRL was liable to the Mickelsons for not having equipped the train with a configuration of lights that would have been more

effective than the configuration that the train in fact had. The MRL train in question had a headlight consisting of two 200,000 candela white lights and, in addition to what the law requires, a single blinking yellow light located directly behind the headlight. In particular, the Mickelsons sought to present evidence that a configuration with two yellow (amber) lights would have been more effective.

¶134 The Court rejects the Mickelsons' interpretation of *Herold* and holds, correctly so, that *Herold* merely requires that such equipment be properly maintained, not that it be effective. Having so held, the Court goes on to hold that, if MRL met all of its federally imposed lighting obligations, evidence of other more effective configurations is not admissible for purposes of establishing railroad liability. However, since the MRL contended that Mickelson was contributorily negligent under § 61-8-347, MCA, for having not seen a "plainly visible" train, the Court concludes that the Mickelsons should have been allowed to rebut that contention. The Court states:

> *While we disagree with the Mickelsons that alternative placement of the lighting has any relevance to whether the train was "plainly visible" to Jim on the night of the accident,* we do agree that since MRL was permitted to allege and represent to the jury that its train was "plainly visible," in part because of its yellow blinking light, thereby triggering Jim's alleged duty to stop for the train, the Mickelsons were entitled to rebut and contradict MRL's position by showing that the single yellow blinking light located behind the locomotive's headlight was ineffective as a warning light.
>
> . . . .
>
> On remand, the jury should be instructed that while it may not consider MRL's failure to equip its train with a particular lighting configuration as evidence of MRL's negligence or culpability, it may nonetheless consider *such evidence* in determining whether the plaintiff was comparatively negligent for failing to see a train which MRL contends was "plainly visible."
>
> Accordingly, we hold that the District Court did not err in precluding the Mickelsons from presenting evidence to show that MRL was liable for failing to equip its train with a particular lighting configuration. However, we also hold that the District Court did err in precluding the Mickelsons from presenting evidence to refute MRL's contention that Jim was comparatively negligent in failing to see the

train which MRL contends was "plainly visible." [Emphasis added.]

¶135 It is unclear to me whether the Court, in allowing the Mickelsons to rebut with "such evidence," is saying that the Mickelsons can rebut with evidence of the ineffectiveness of the configuration in question, or whether our decision allows the Mickelsons to go further and present evidence as to what other configurations would have been more effective than the one used. I concur with the proposition that the Mickelsons be allowed an opportunity to rebut the testimony as to the "visibility" of the configuration used on the train in question. This can be accomplished through testimony from witnesses, either expert or lay, that the yellow light configured with the two white lights was not plainly visible. I do not agree that they should be able to rebut the visibility question with evidence of other alternative configurations that might have been more effective. The only configuration at issue is the one on the train in question in July of 1991. As the Court concedes, evidence of other configurations is not relevant as to whether the configuration at issue was plainly visible to Jim on the night in question. Furthermore, if the Mickelsons are allowed to present evidence of other configurations, the jury would assume, since such evidence has nothing to do with rebutting Jim's alleged comparative negligence, that it relates to the question of liability. In other words, in oblique fashion, we would be allowing the Mickelsons to circumvent the court's ruling in *Herold* and suggest to the jury that MRL is *liable* for not having equipped the train with a different lighting configuration than it did.

¶136 In conclusion, I concur with the holding that the *Herold* case does not stand for the proposition that when a railroad equips a train with extra equipment beyond that required by law, it must assure that that equipment is not only maintained, but effective. I concur that the Mickelsons can rebut the "visibility" issue with evidence that the lighting configuration on this train was not "plainly visible." In doing so, however, they may not present evidence of other configurations that might have been more effective.

/S/ W. WILLIAM LEAPHART

Justice Karla M. Gray, concurring in part and dissenting in part.

¶137 Except as specifically set forth herein, I agree with and join the Court's opinion.

¶138 I join Justice Leaphart's dissent on issue 3, relating to the District Court's grant of

partial summary judgment on the "adequate auditory warning" issue. Our standards regarding summary judgment have long been established and, in this regard, include a burden on the nonmoving part to raise a genuine issue of *material* fact once the moving party has established the absence of any such issue. As Justice Leaphart so cogently points out, the Court's opinion on this issue largely negates that burden traditionally borne by the nonmoving party by allowing the Mickelsons to avoid summary judgment via the raising of credibility issues on nonmaterial, nonrelevant matters.

¶139 On issue 5, I join in the Court's conclusion that the Mickelsons' reliance on *Herold* is misplaced. However, I dissent from the remainder of the Court's discussion of issue 5 and from its conclusion that, while the Mickelsons are precluded from presenting evidence relating to additional lighting or alternative lighting for the purposes of establishing MRL's liability, they may introduce such evidence for other purposes. My dissent is based on our long-established rule that we will not address either a matter raised for the first time on appeal or a party's change in legal theory. *See, e.g., Unified Industries, Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15 (citation omitted). The underlying rationale for our rule is that it is unfair to hold a district court in error on a basis never presented to it. *Easley*, at ¶ 15. Here, *Herold* was the Mickelsons' sole argument on this issue before the District Court and, indeed, in its opening brief on appeal to this Court. I would resolve this issue on that basis alone and affirm the District Court.

¶140 Finally, I respectfully dissent from the Court's opinion on issue 2, which is whether the District Court erred in instructing the jury as to the speed of trains. My disagreements and concerns about the Court's analysis of this issue are several.

¶141 First, the Court does not specifically address whether the District Court's Instruction No. 32 was improper. That instruction essentially stated that the driver of any emergency vehicle has no special privilege with regard to railroad crossings under Montana law. Given the language of §§ 61-8-347 and 61-8-348, MCA, as set forth in the Court's opinion, I conclude that Instruction No. 32 is a proper statement of the law and that the District Court did not abuse its discretion in so instructing the jury.

¶142 In addition, it is my view that the Court's discussion of the trial court's Instruction No. 21 and *Runkle* is, at best, confusing. Indeed, I am unable to ascertain from the Court's opinion whether the District Court should have instructed on a purported duty by MRL to slow for this particular crossing even absent the existence of a specific, individual hazard at the time of the accident at issue in this case, or whether it should have instructed with

regard to a duty to slow only when faced with the specific conditions relating to the fire and the existence of emergency vehicles in the area of the railroad crossing at the time the train started down Evaro Hill.

¶143 This issue is more easily understood by addressing not just the instruction given by the District Court, but one of the Mickelsons' proposed instructions, which was refused, and about which the Mickelsons also assert error. The Mickelsons' Proposed Instruction #29 read as follows:

> If, under the standard of ordinary care, a reasonable and prudent railroad would have braked the train to slow or reduce the speed of its train under the circumstances existing here, failure to do so may constitute negligence, although no ordinance or statute exists requiring such braking or slowing or reduction in speed. The railroad also has a duty to slow or stop its train to avoid a specific individualized hazard at a crossing if an ordinarily prudent railroad would have done so under the same or similar circumstances.

This proposed instruction contains two separate duties: the first, one of ordinary care relating to the circumstances existing at the time of the accident in question; and the second, one of ordinary care relating to a duty to avoid a specific, individualized hazard at a crossing.

¶144 With regard to the first duty set forth in the proposed instruction, I agree with the Court that, under *Runkle*, the instruction would have been appropriate. The problem, however, is that *Easterwood*--decided by the United States Supreme Court some 13 years after *Runkle*--effectively nullified the availability of a state tort general negligence claim regarding train speed by concluding that regulations adopted under the Federal Railroad Safety Act preempted such claims.

¶145 With regard to the second duty set forth in the Mickelsons' Proposed Instruction #29, namely, that MRL had a duty to slow or stop the train to avoid a specific individualized hazard at a crossing if an ordinarily prudent railroad would have done so under the circumstances, and the Court's related discussion of the "specific, individual hazard" portion of *Easterwood*, my concern is that neither the Court's opinion nor the Mickelsons' arguments are sufficiently clear to ascertain precisely what specific, individual hazard purportedly is at issue here. To the extent the Court is holding that the mere presence of emergency vehicles in the area near a crossing is sufficient to impose a duty on railroads

to slow their trains, I disagree. Such a state tort law general duty to slow is precluded by *Easterwood* and also fails to meet the "specific, individual hazard" standard as determined in post-*Easterwood* cases. The cases determining that such a hazard exists so as to avoid federal preemption relate to the avoidance of a specific collision, slowing to avoid striking a child on the railway and the like. *See, e.g., Armstrong v. Atchison, Topeka & Santa Fe Ry. Co.* (W.D. Tex. 1994), 844 F.Supp. 1152, 1153; *Bashir v. National R.R. Passenger Corp.* (S.D. Fla. 1996), 929 F.Supp. 404, 412. Indeed, the contention that the mere presence of emergency vehicles in the area is a specific, individual hazard sufficient to impose a duty to slow is similar to the "presence of fog and the nearby brick facility" contention rejected as constituting specific, individual hazards in *Williams v. Alabama Great Southern Railroad Co.* (E.D. La. 1994), WL 419863. As the *Williams* court stated, *Easterwood*'s "footnote [15] means what it says--namely, if possible, a train should reduce its speed in order to avoid an imminent collision."

¶146 Finally, the Court's discussion regarding proof that the train "could have easily slowed or stopped to avoid the accident" is of no legal relevance. The issue is whether there was a duty to slow. I would conclude that the duty set forth in the District Court's Instruction No. 21--namely, that there was a duty to slow when it was reasonable to believe that the emergency vehicle would not yield and there was a substantial risk of collision--was a proper statement of the law under the *Easterwood* progeny addressing specific, individual hazards. *See O'Bannon v. Union Pacific R. Co.* (W.D. Mo. 1997), 960 F.Supp. 1411, 1420 (citations omitted). Accordingly, I would affirm the District Court on issue 2.

/S/ KARLA M. GRAY

Chief Justice J. A. Turnage joins in the concurring and dissenting opinions of Justice Leaphart and Justice Gray.

/S/ J. A. TURNAGE

Justice Terry N. Trieweiler specially concurring and dissenting.

¶147 I concur with the majority's resolution of Issues numbered 1, 2, 3, and 8. I agree with the majority's decision not to address Issues numbered 4, 6, and 7. I specially concur with the majority's resolution of Issue No. 5; and I dissent from the majority's disposition of Issue No. 9.

¶148 I concur with the majority's conclusion in part 5 of its opinion that the District Court erred by excluding evidence that the locomotive's lighting configuration was inadequate to make it "plainly visible." However, I disagree with and, therefore, dissent from the majority's conclusion that this case is distinguishable from *Herold v. Burlington Northern, Inc.* (8th Cir. 1985), 761 F.2d 1241, simply because the allegation in this case was that the amber rotating beacon was "ineffective," whereas in *Herold* the plaintiffs complained that a beacon, which had been installed but then removed, was not in "good operating condition." That distinction, in my opinion, makes no difference to the court's holding in *Herold*. In *Herold*, the plaintiffs were also struck at a railroad crossing. The court noted that Burlington Northern equipped its locomotives with amber rotating beacons even though it was not required to do so by federal law. Plaintiffs were allowed to prove in the district court that the amber rotating beacon had been removed for repairs. On appeal, the railroad contended that because it was not required to install an amber rotating beacon, it was error for the district court to allow evidence that it had been removed.

¶149 The Eighth Circuit Court of Appeals disagreed and observed:

> [T]here is no issue whether Burlington Northern can be required to install additional warning lights. Burlington Northern had already made the decision to use a beacon and had, in fact, installed one on the locomotive involved in this collision. The district court ruled the beacon was an "appurtenance" of the locomotive within the meaning of the Boiler Inspection Act, 45 U.S.C. § 23. The Act "imposes upon the carrier an absolute and continuing duty to maintain the locomotive, and all parts and appurtenances thereof, in proper condition, and safe to operate in active service without unnecessary peril to life or limb. *Southern Railway. Co. v. Lunsford*, 297 U. S. 398, 401, 56 S. Ct. 504, 506, 80 L. Ed. 740 (1936).

*Herold, 761 F.2d at 1245 (citations omitted). In other words, the Eighth Circuit did not distinguish between an "appurtenance" which was "ineffective" and one which was simply not in "good operating condition" as the majority does. The Eighth Circuit simply held that once an appurtenance is installed on a locomotive, the Boiler Inspection Act requires that it be maintained in a manner that it does not cause "unnecessary peril to life or limb."*

¶150 In this case the Plaintiffs alleged that the amber rotating light was not maintained in such a way as to avoid unnecessary peril to life or limb because of its placement. I see no practical difference between the allegation in this case and the allegation in *Herold* that a light which was not required in the first place had been removed.

¶151 For these reasons, I dissent from the majority's conclusion that *Herold* is not applicable. Furthermore, I disagree with the majority's statement in ¶ 88 of its opinion that, " . . . we disagree with the Mickelsons that alternative placement of the lighting has any relevance to whether the train was "plainly visible" to Jim on the night of the accident, . . . ." That statement is inconsistent with the majority's conclusion in ¶ 96 that the District Court erred by precluding Mickelsons from refuting MRL's contention that the train was "plainly visible" in part because of the presence of a rotating yellow light. The only way to rebut the railroad's contention was to prove that the rotating yellow light contributed nothing to the train's conspicuity because of its placement. I do believe that the majority's ultimate conclusion is correct, but that the unnecessary and incorrect language in ¶ 88 will be confusing to the parties and possibly the District Court.

¶152 I also dissent from the majority's conclusion that the consortium claims of Vickie and Jim's children are barred if Jim was 50 percent or more negligent. That conclusion is totally inconsistent with the majority's first conclusion that the claims are not reduced by Jim's contributory negligence based on the language of the contributory negligence statute found at § 27-1-702, MCA.

¶153 It makes no difference whether the consortium claims are derivative or independent, and it makes no difference whether other courts have held that a loss of consortium claim should be reduced by a spouse's or parent's negligence. In Montana, the language of the contributory negligence statute is dispositive. It simply provides that "damages allowed must be diminished in proportion to the percentage of fault *attributable to the person recovering*." Section 27-1-702, MCA (emphasis added.) In this case, the persons recovering damages for loss of consortium are Vickie and Jim's children. Both parties concede that they were not in any way at fault for Jim's injuries. Therefore, based on the plain language of § 27-1-702, MCA, their recovery, if any, cannot be diminished based on contributory fault.

¶154 The majority avoids the application of the plain language of the statute by creating an artificial distinction where none has previously existed. It concludes out of whole cloth that the consortium claims are independent as to damages but derivative as to liability. In doing so, the majority picks and chooses that part of the contributory negligence statute that it chooses to apply. It concludes that if Jim was not more than 50 percent at fault there can be no reduction but that if Jim was more than 50 percent at fault there can be no recovery. There is no basis in the plain language of the statute for making this artificial distinction. Courts may not rewrite statutes to achieve what the majority of the court

considers a more satisfactory result. *See* § 1-2-101, MCA.

¶155 The majority's response is that if we apply the plain language of § 27-1-702, MCA, there would be "an anomaly in the area of tort law." Because the majority concludes the legislature could not have intended to do that which it plainly did, the majority has simply rewritten the statute to its satisfaction. I would not do so. If § 27-1-702, MCA creates an anomaly in the area of tort law, it is up to those interest groups who are adversely affected to bring it to the legislature's attention and it is up to the legislature to change the law accordingly.

¶156 For these reasons, I concur in part and dissent in part from the majority decision.


/S/ TERRY N. TRIEWEILER