FILED

06/27/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0363

DA 16-0363

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 157

KERRIE EVANS,

        Plaintiff and Appellant,

    v.

PEGGY SCANSON, CNP and WILLIAM PETERS, M.D.,

        Defendants and Appellees.

| | |
|---|---|
| APPEAL FROM: | District Court of the Eighteenth Judicial District, In and For the County of Gallatin, Cause No. DV 11-990B Honorable Mike Salvagni, Presiding Judge |

COUNSEL OF RECORD:

        For Appellant:

                E. Casey Magan, Russell S. Waddell, Waddell & Magan, Bozeman, Montana

        For Appellees:

                Julie Lichte, Danielle A.R. Coffman, Jill Laslovich, Crowley Fleck PLLP, Bozeman, Montana

                John A. Scully, Cooper & Scully, Dallas, Texas
                (*Attorneys for Peggy Scanson, CNP*)

                Lisa A. Speare, William J. Speare, George T. Kimmet, Speare Law Firm, Billings, Montana
                (*Attorneys for William Peters, M.D.*)

                      Submitted on Briefs: April 19, 2017
                            Decided: June 27, 2017

Filed:

                              _____
                                      Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1  Kerrie Evans (Evans) appeals from a jury verdict after a nine-day trial in the Eighteenth Judicial District Court that found Peggy Scanson (Scanson) and William Peters, M.D. (Dr. Peters) did not deviate from the standard of care when providing Evans with prenatal care. Evans seeks a new trial or amended judgment based on our disposition of the following issues:

> *1. Whether the District Court erred by admitting collateral source testimony under the rule of curative admissibility.*
>
> *2. Whether the District Court abused its discretion by ruling expert testimony was within the scope of its corresponding disclosure and otherwise admissible.*
>
> *3. Whether the District Court erred by refusing to grant a new trial or alter the judgment after hearing defense counsel's closing argument.*

¶2  We affirm.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

¶3  Kerrie Evans' child was born in 2010 with Cystic Fibrosis (CF), a chronic condition that will require medical care for the rest of her life. Faced with the prospect of paying for years of medical expenses, Evans filed suit to recover against the medical professionals who provided her with prenatal care and counseling because, she alleged, she would have opted to abort her pregnancy had she been timely provided with the child's CF diagnosis *in utero*. Evans saw Scanson, a nurse practitioner at Livingston HealthCare, for a prenatal

---

[1] Evans asked that we consider her fourth issue, whether the District Court erred by refusing to grant partial summary judgment on the issue of causation, if we "reversed and remanded under Issues 1-3[.]" Accordingly, since we affirm the District Court on issues 1-3, we do not consider Evans' fourth issue.

care appointment in October of 2009. Evans was 38 years old. Scanson's notes from this visit indicate the fetus was at risk for Down syndrome due to Evans' advanced age, that Evans wanted the fetus tested, and that Evans would abort for an abnormality. During that initial visit, Scanson provided Evans with pamphlets containing information on pregnancy, childbirth, and prenatal screening and diagnosis for genetic disorders, including CF.

¶4 One of the pamphlets focused on CF screening and diagnosis. CF is a genetic disease, but the age of the mother does not increase its probability of occurrence, as is the case with Down syndrome. The pamphlet explained that testing for CF begins with an analysis of test samples from both parents to determine whether they carry the CF gene. The brochure stated that, if both parents are carriers, there is a one-in-four chance their child will have CF and "further prenatal testing can be done to see whether [the] baby has CF." If both parents carry the CF gene, the additional prenatal tests to determine whether the baby will have CF are chorionic villus sampling (CVS), and amniocentesis.

¶5 Accordingly, one of the pamphlets Scanson gave Evans also provided information on amniocentesis and CVS, explaining that pregnant women who are 35 or older on their due date should opt for one of these tests because "the risk of having an infant with a chromosomal problem such as Down syndrome increases with the age of the woman." The brochure discussed the differences between the two tests, particularly that CVS can be performed earlier in the pregnancy. Scanson recalled, and her notes confirmed that Evans was concerned during the visit that her child would have Down syndrome and that she would opt to abort if that were so. Evans alleged, however, that she asked for CF testing as well as testing for Down syndrome.

3

¶6 According to Scanson, she gave Evans the pamphlet on prenatal testing and informed her that Dr. Peters could perform the CVS. Scanson stated that Evans preferred CVS over amniocentesis because it could be performed sooner than amniocentesis and would test for Down syndrome. At that time, Scanson also informed Evans that Dr. Peters would need an ultrasound of the fetus prior to performing the test. After scheduling the ultrasound, Scanson returned to the exam room and began discussing CF with Evans. Scanson showed Evans the CF pamphlet and discussed the information it provided, stressing that it was important. Scanson instructed Evans to read the pamphlet and review it with her husband. Evans agreed at trial that the pamphlet's information was "fairly clear," but in the end, she and her husband did not read through the information Scanson provided, including the pamphlet on CF, until after her daughter was born.

¶7 Scanson also instructed Evans to schedule mandatory genetic counseling prior to the CVS test. In conjunction with Scanson's instruction, Dr. Peters sent Evans a letter explaining that she needed to call the genetic counselor for an appointment prior to the CVS test. The record reflects that Evans declined the genetic counseling because she was concerned about its expense. Dr. Peters nonetheless performed the CVS test. Dr. Peters testified at trial that, during Evans' visit for CVS, he explained to her that CVS could identify chromosomal abnormalities like Down syndrome. He again instructed her to schedule genetic counseling and informed her that if she wanted, he could draw her blood for CF carrier screening, and that additional testing was available if she returned a positive result. She did not ask for the initial CF carrier screening.

¶8 Evans filed a complaint on October 21, 2011, alleging that Scanson, Dr. Peters, and other defendants did not sufficiently inform her that the CVS she received would only test for Down syndrome and certain other abnormalities, but not CF. She asserted claims in equity, negligence, negligent misrepresentation, and negligent infliction of emotional distress. By the time of trial, only Scanson and Dr. Peters remained as defendants to the suit, and Evans' theories of recovery had been winnowed to negligent infliction of emotional distress and negligence, as a medical malpractice action. The jury found that Scanson and Dr. Peters did not breach the standard of care in treating Evans and so did not consider the remaining elements of negligence—causation and damages. Whether Scanson's and Dr. Peters' treatment fell below the standard of care turned on whether they had adequately informed Evans of her genetic screening options, and the credibility of her own testimony that she would have aborted her pregnancy had she known of an abnormality. Although Evans testified to her concerns of genetic disorders and to her willingness to terminate her pregnancy, Scanson and Dr. Peters testified that Evans had been adequately informed of her screening options and the nature of the tests she would undergo when Peters wrote and advised her and when Scanson provided her with brochures on CF and genetic counseling resources.

¶9 At trial, Evans introduced testimony relating to her insurance coverage and medical expenses to counter defense assertions that she would have declined medical services like genetic counseling because of cost, and also to establish the extent of her damages and cause of her mental anxiety relating to her negligent infliction of emotional distress claim. She objected and sought a mistrial, however, when the District Court permitted the jury to

5

hear similar evidence when it was elicited by defense counsel. Evans argued at trial, as she does on appeal, that the defense's line of questioning and testimony violated Montana's statutory prohibition against a jury hearing collateral source evidence, § 27-1-308(3), MCA. Evans made similar arguments regarding expert testimony that centered on the affordability of care and treatment options available for individuals with CF. At the conclusion of the trial, she premised her motion for a new trial in part on the injection of such collateral source testimony throughout trial, and in part on certain of defense counsel's closing statements, which she alleged were inflammatory. She seeks reversal of the District Court's denial of her motion for mistrial and her post-trial motion for new trial. We affirm the District Court's rulings denying her motions.

## STANDARDS OF REVIEW

¶10   We review a district court's evidentiary rulings for an abuse of discretion, which occurs if the court acts arbitrarily without employment of conscientious judgment, or if it exceeds the bounds of reason and substantial injustice results. *Byrum v. Andren*, 2007 MT 107, ¶ 15, 337 Mont. 167, 159 P.3d 1062. We review a district court's denial of a motion for a mistrial or an M. R. Civ. P. 59 motion for a new trial for a manifest abuse of discretion. A manifest abuse of discretion is obvious, evident, or unmistakable, and significant enough to materially affect the substantial rights of the complaining party. A district court's denial of a mistrial must be based on whether the moving party was denied a fair and impartial trial. We will not lightly disturb the district court's determination to deny a mistrial, as the district court is in the best position to determine the prejudicial effect of attorney

6

misconduct on the jury. *O'Connor v. George*, 2015 MT 274, ¶ 17, 381 Mont. 127, 357 P.3d 323.

## DISCUSSION

¶11 *Issue 1: Whether the District Court erred by admitting collateral source testimony under the rule of curative admissibility.*

¶12 Evans' concerns of cost were central to the District Court's evidentiary rulings that comprise the primary basis of this appeal. Indeed, in her complaint, Evans stated that "[g]enetic counseling should also have been covered in full as a maternity benefit under [Evans'] BCBS insurance, and would have cost her nothing." At trial, Evans first introduced her concerns of cost during *voir dire*, stating that she could not afford the child's medical expenses and so had to sue to recover from her healthcare providers. In her opening statement too, her counsel informed the jury that, "[Evans and her husband] can't afford that type of extraordinary care that a child would need." Although Evans had filed for and been granted two motions to exclude collateral source evidence, including evidence of Evans' health insurance, Evans nevertheless introduced evidence of her health insurance. On direct examination, Evans' counsel elicited testimony from Evans that indicated she would not have refused genetic counseling on the basis of cost because she had excellent health insurance as a federal employee. She answered additional questions on direct examination about her out-of-pocket expenses, co-pays, the identity of her carrier, and the existence and scope of her insurance coverage. Evans also testified to her fear of being unable to afford her daughter's medical care. During closing statements, Evans'

7

counsel proffered that it would be illogical to conclude that Evans would "decline anything due to costs when she had health insurance, which she testified to covered everything."

¶13 On cross-examination, Scanson's counsel moved outside of the jury's presence to be allowed to ask Evans questions regarding her insurance coverage, arguing that Evans had opened the door to examine the topic of health insurance by giving the jury the impression she is financially unable to care for her child. Evans' counsel countered that only Evans should be allowed to introduce evidence of her health insurance, to which Scanson's counsel replied, "my client [should] not be prejudiced by the Plaintiff's decision to inject health insurance into the trial without me being able to explain and address the health insurance situation." The District Court granted Scanson's motion and permitted defense counsel to question Evans on whether she had health insurance, and what the policy provisions were. Yet, to narrow the breadth of questioning under the collateral source rule, the court did not permit defense counsel to question Evans on the amounts the policy paid for her medical expenses, or what the limits of her coverage were. Additionally, the court limited the nature of defense counsel's inquiry to Evans' claim for emotional distress, since Evans had premised that claim on anxiety arising from her baby's unaffordable medical care. To comply with the court's instructions, Scanson's counsel asked Evans five questions regarding insurance: (1) whether Evans had insurance through her employer; (2) how long she had that insurance; (3) whether her insurance covered her child; (4) whether her insurance covered the child from birth; and (5) whether the child was currently covered by insurance.

¶14 On appeal, Evans argues that she was forced to introduce evidence of insurance coverage to refute the defense claim that she refused genetic counseling because of its expense. Scanson and Dr. Peters argue that Evans in fact exceeded that threshold by introducing evidence of insurance not only during her pregnancy, when the genetic counseling was at issue, but also post-partum, introducing evidence of her out-of-pocket expenses for the child's medication and the general cost of her daughter's medical care. Scanson claims in response that Evans should not be permitted to open the door to these topics without an opportunity for Scanson to respond.

¶15 "Under the rule of curative admissibility, or the 'opening the door' doctrine, the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission." *Stevenson v. Felco Indus.*, 2009 MT 299, ¶ 40, 352 Mont. 303, 216 P.3d 763 (quoting *U.S. v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988)). Despite the potential prejudice to a plaintiff, collateral source information may be introduced where there has been a persuasive showing that the evidence has substantial probative value. *Mickelson v. Mont. Rail Link, Inc.*, 2000 MT 111, ¶ 38, 299 Mont. 348, 999 P.2d 985. Here, the proffered testimony complies with the rule of curative admissibility and our rule in *Mickelson*. Scanson's counsel elicited collateral source testimony only after Evans had herself injected collateral source matters into the proceedings—in her complaint, in *voir dire*, and on direct examination. The District Court was therefore entitled to exercise its discretion in admitting rebuttal evidence on the same issue under the rule of curative admissibility articulated in *Stevenson*. In light of Evans'

repeated references to collateral source information, the fact that she made affordability the cornerstone of her negligent infliction of emotional distress claim, and her assertion she would not have refused genetic counseling because of her adequate insurance coverage, the District Court did not arbitrarily admit the rebuttal evidence without conscientious judgment. Neither can we conclude that Evans suffered substantial injustice by its admission, since she first determined herself that such evidence was at issue and ought to be brought into the proceedings. Thus, despite the potential for such evidence to prejudice the jury, it bore substantial probative value to the plaintiff as a tenet of her claims, and to the defendant as a means of impeachment. We note here too, that the District Court took steps to dispel the potential prejudicial effect of defense counsel's efforts by limiting the scope of the permitted inquiry to whether Evans had insurance and the nature of its provisions. That limitation, coupled with the precision of defense counsel's questioning, constrained the potentially prejudicial effects the evidence may have had on the jury and enhanced its probative value such that its admission sufficiently complied with our rule in *Mickelson*.

¶16 *Issue 2: Whether the District Court abused its discretion by ruling expert testimony was within the scope of its corresponding disclosure and otherwise admissible.*

¶17 Evans argues also that the District Court erred by refusing her motion for a mistrial following the testimony of her expert witness, Dr. Lysinger, who testified regarding the expense of Orkambi, a drug used to treat CF. At trial, Dr. Lysinger testified on direct examination that he had been told by a pharmacist that Orkambi costs $294,000 per year. On cross-examination, Scanson's counsel asked him whether he was aware that Orkambi's

10

manufacturer had "a program that is designed to help cystic fibrosis families and physicians understand how to obtain Orkambi." Evans objected to this question and others like it on collateral source grounds. The District Court sustained the objections and the witness did not answer. The court had already instructed the jury that, "when I strike an answer that means that you're . . . to disregard the answer[.] I'm not allowing the answer and you're not to consider the answer." Evans moved for a mistrial, arguing that Scanson had raised the issue of insurance or other collateral sources. The District Court denied the motion after an in-chambers discussion, agreeing with defense counsel that the line of questioning had not violated the court's order against introducing evidence of collateral sources or insurance, but was instead meant to impeach the witness's credibility and show the witness did not "research whatsoever into the cost of the drug." The court took the additional curative step of providing a final jury instruction that cautioned the jury against guessing the answer to any stricken question or drawing inferences from the question itself.

¶18    Evans also argues the District Court abused its discretion by overruling her objections concerning the testimony of Dr. Merlo, a pulmonary and critical care specialist from Johns Hopkins specializing in CF, who was called as a defense expert to rebut the opinions of Evans' experts. Evans objected to Dr. Merlo's testimony as outside the scope of his expert disclosure and because, she alleged, he testified to collateral source information. Scanson disclosed Dr. Merlo as an expert who would not only testify to "rebut the opinions of Plaintiff's experts[,]" but also regarding the medical treatment of adult patients with cystic fibrosis; the long-term management of CF; and that CF is a chronic, manageable disease. Evans objected initially on disclosure grounds when Scanson's

11

counsel asked Dr. Merlo whether he "ever had the situation where a cystic fibrosis patient in need of a cystic fibrosis drug was unable to obtain it[.]" After examining the expert disclosure, the District Court overruled Evans' objection and permitted Dr. Merlo to answer. When the question was repeated for the record, Evans objected again, this time on collateral source grounds, which the District Court overruled. Evans soon objected to another question, also on collateral source grounds, which the court sustained:

> [By Scanson's counsel] Q: Have you ever had a patient who was unable to get Orkambi [the $294,000 per year drug] due to cost?
>
> A: No
>
> [By Evans' counsel]: Objection Your Honor, Collateral Source. Outside the scope of disclosure as well.
>
> THE COURT: Sustained. The answer is stricken.

¶19 When counsel objects to the admission of evidence, the district court is presumed to have cured any error committed by sustaining counsel's objection, striking the evidence from the record, and instructing the jury to disregard the evidence. *State v. West*, 252 Mont. 83, 91, 826 P.2d 940, 945 (1992). Evans made multiple objections to the testimony given by Dr. Lysinger. The court sustained the objections, and had instructed the jury that it was to disregard the testimony. The error alleged by Evans because of that stricken testimony is therefore presumed cured. In examining the record, and in light of the great deference we afford a district court's determination to deny a mistrial, we cannot conclude that the District Court here committed a manifest abuse of discretion by striking the testimony, conducting an in-chambers hearing and instructing the jury, but refusing to grant a mistrial.

12

The District Court overruled Evans' collateral source objection, however, when Dr. Merlo was questioned. We conclude that this question, probing the accessibility of Orkambi, served as rebuttal to Dr. Lysinger's testimony that Orkambi costs $294,000 per year. As such, it fell within the rule of curative admissibility and bore sufficient probative value to overcome any prejudice to the jury.

¶20 We further conclude that the District Court did not abuse its discretion by ruling Dr. Merlo's testimony fell within the scope of his expert disclosure. The rule of evidence governing expert disclosures, M. R. Civ. P. 26, is meant to eliminate surprise and promote the effective cross-examination of witnesses. *Hawkins v. Harney*, 2003 MT 58, ¶ 26, 314 Mont. 384, 66 P. 3d 305. Refusing the testimony of an expert is an extreme sanction when the offense arises from incomplete discovery, but one which we have upheld when opposing counsel's ability to effectively cross-examine the witness has been severely limited. *Hawkins*, ¶¶ 22-23. But even a brief expert disclosure, so long as it identifies the facts and opinions to which the expert is expected to testify, can be sufficient to eliminate the possibility that opposing counsel will be surprised by the testimony or unable to adequately prepare for cross-examination. *Hawkins*, ¶¶ 25-26. Here, the District Court did not exceed the bounds of reason or act arbitrarily by admitting Dr. Merlo's testimony. Defense counsel laid out the basis of his testimony as rebuttal evidence to the plaintiff's expert, who testified to the exorbitant costs of caring for patients with CF. The disclosure additionally revealed that he would testify to the manageability and medical treatment of the disease. It was reasonable therefore, for the District Court to conclude that, based on this disclosure, plaintiff's counsel could adequately prepare to cross-examine him when

13

and if his testimony addressed his own experience of dealing with patients who might have had difficulty procuring the costly medications required to treat the disease. The disclosure at issue here in fact exceeds what we previously upheld in *Hawkins*, where the grounds for the expert's opinions were addressed with the phrase, "standard veterinary teaching and practice." *Hawkins*, ¶ 25. We conclude therefore that the District Court did not abuse its discretion by admitting Dr. Merlo's testimony over Evans' objection.

¶21    *Issue 3: Whether the District Court erred by refusing to grant a new trial or alter the judgment after hearing defense counsel's closing argument.*

¶22    Evans lastly argues that Scanson's and Dr. Peters' counsel made inflammatory statements during closing arguments that were sufficiently prejudicial to constitute reversible error. She argues that the statements, which exhorted the jury to ponder the immensity of the award sought, violated a Motion *in Limine* previously filed by counsel, but never adopted by the District Court. Evans did not, however, contemporaneously object to these statements at trial. Evans did object though, when, during closing, Dr. Peters' counsel admonished the jury that Evans' child was not the plaintiff in the case, and that although under Montana law a parent is entitled to bring an action on behalf of a child, Evans had not done so, opting instead to recover for her own damages and not those of the child. To that, the District Court issued an instruction that there had "been no determination under Montana law as to whether a parent can bring a cause of action on behalf of the parent's child relating to the issues involved in this case." Evans argues here that the instruction was insufficient, prejudicial, and warranted granting her motion for a new trial, or to alter or amend the judgment. The District Court did not rule on her motion for a new

trial and so the motion was deemed denied pursuant to M. R. Civ. P. 59. *See Challinor v. Glacier Nat'l Bank*, 283 Mont. 342, 344, 943 P.2d 83, 84 (1997).

¶23 A party who fails to contemporaneously object to purportedly impermissible comments during closing argument forfeits the right to appeal that error. To preserve an issue for appeal, a party must object when the grounds for the objection become apparent. *McDermott v. Carie*, 2005 MT 293, ¶ 14, 329 Mont. 295, 124 P.3d 168. If defense counsel made the allegedly inflammatory comments during closing argument, the grounds for objection became apparent during the closing argument. Evans argues the comments violated a proposed Order *in Limine* that addressed inflammatory statements and so obviated the need to object. We disagree. Ultimately, the District Court did not adopt the proposed order and so reliance upon it does not bolster Evans' arguments on appeal. Regardless of the order, however, if Evans believed the comments were inflammatory, Evans should have objected and stated so when the comments were made, allowing the court to rule on the issue. A party may not preserve an issue for appeal, even if based on an opponent's violation of an order *in limine*, without the party first obtaining a definitive ruling from the district court on the issue. *State v. Favel*, 2015 MT 336, ¶ 19, 381 Mont. 472, 362 P.3d 1126. We decline to create such precedent here.

¶24 Evans did timely object, however, to Dr. Peters' statement that parents in Montana are legally entitled to bring an action on behalf of their minor children, but chose not to do so in this action. On appeal, she argues this was an inflammatory statement that prejudiced the jury to believe she was acting out of avarice for herself instead of her child's well-being. If the statement was inflammatory, Evans' argument that the District Court's jury

15

instruction did not adequately address Dr. Peters' statement of the law has shortcomings. Although the District Court has an obligation to ensure a fair trial, a fair trial is not necessarily an error-free trial. To support her argument, Evans calls our attention to *Lopez v. Josephson*, 2001 MT 133, ¶ 35, 305 Mont. 446, 30 P.3d 326. There, we stated that, "[t]he repeated asking of questions clearly intended to keep the assumption of damaging facts which cannot be proven before the jury, in order to impress upon their minds the probability of the existence of the assumed facts upon which the questions are based, constitutes gross misconduct." *Lopez*, ¶ 35. And indeed, in Lopez, we found error where the District Court allowed counsel to repeatedly inject evidence into the proceedings after he had been cautioned against it—to the extent we found it "difficult to grasp just how ubiquitous and egregious the conduct of plaintiffs' counsel was[,]" and that "[o]nly a complete transcript review [could] establish the actual extent of counsel's misconduct." *Lopez*, ¶ 36. We do not find the alleged misconduct here nearly so pervasive or pernicious. Here, counsel made a single statement during closing that arguably reflected an accurate statement of Montana law. Evans objected to the statement and, after an in-chambers hearing, the District Court issued a curative instruction to the jury that explained counsel's statement might not be entirely accurate given the facts of the case. This does not rise to the level of egregious conduct and inadequate cure by the District Court that we identified in *Lopez*.

¶25 Moreover, since Evans objected to the comment contemporaneously, the District Court was able to take effective corrective action by issuing a curative instruction. Our review of the record reveals a thorough discussion of the comment at issue and the current

16

state of Montana law, in addition to ways in which the District Court could adequately address Evans' concerns over the comment. To that end, the District Court formulated the curative instruction in discussion with all counsel present, revised it more than once to address Evans' counsel's concerns, sought his definitive approval of the final wording, and then wrote it down to preserve the exact wording for presentation to the jury. Evans' counsel did not object to the instruction or state during the hearing that it would inadequately remedy defense counsel's remark. We conclude upon our review of the proceedings that this instruction, which Evans' counsel sought and argued, did not prejudice Evans' right to a fair trial, especially given that Evans' counsel participated in and did not object to its formulation.

¶26    A district court is in the best position to observe jurors and the potentially prejudicial effects of evidence presented to them. We, accordingly, afford district courts broad discretionary latitude when ruling on prejudicial evidence. *O'Connor*, ¶ 17. When a district court withdraws or strikes improper testimony from the record and provides the jury an accompanying cautionary instruction, the error committed is presumed cured. Reciprocally, we do not presume that the jury will ignore the district court's instructions. *State v. Long*, 2005 MT 130, ¶¶ 25-27, 327 Mont. 238, 113 P.3d 290. Here, the District Court was in the best position to gauge the effect of the statement on the jury and its ability to deliver a fair verdict. The court's instruction is presumed to have cured the error alleged, particularly given Evans' counsel's approval of it as a remedy and his participation in its formulation. We do not find in our review of the record here any evidence of misconduct comparable to the behaviors we discovered in *Lopez*, which would be sufficient to

17

overcome the presumption that the instruction cured the error.  The District Court did not therefore exhibit an obvious abuse of discretion significant enough to materially affect Evans' substantial rights when it issued the curative jury instruction in response to the comment.

## CONCLUSION

¶27     The judgment and rulings of the District Court are affirmed.


                                                    /S/ LAURIE McKINNON


We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR